**ELLER MEDIA COMPANY, Appellant,**

v.

**CITY OF HOUSTON, Texas, Appellee.**

No. 01–00–00588–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 6, 2003.

Rehearing Overruled March 6, 2003.

Kenneth S. Marks, Susman, Godfrey L.L.P., Houston, for Appellant.

Elizabeth L. Pool, Assistant City Attorney, Houston, for Appellee.

Panel consists of Justices HEDGES, NUCHIA, and HANKS.

## OPINION ON REHEARING

SAM NUCHIA, Justice.

The opinion issued on October 25, 2001 is withdrawn, and this opinion is issued in its place.

Appellant, Eller Media Company, and several other outdoor advertising plaintiffs sued appellee, the City of Houston, challenging the validity of the amended Houston Sign Code and alleging, among other things, a taking without compensation in violation of the Texas and United States Constitutions, a violation of the right of free speech under the First Amendment, and a violation of state law governing the regulation of billboards. The trial court entered judgment declaring that the amended Sign Code does not violate the First Amendment and does not constitute an unlawful taking of property under the United States Constitution or the Texas Constitution. The judgment declared that signs designated "Permit Nonconforming" are free from local amortization,[1] signs designated as "Bring Into Conformance" are to be removed according to the amortization schedule, and signs designated as "Useful Life" are subject to immediate removal on the order of the City of Houston. We affirm.

## BACKGROUND

In 1980, the City of Houston, for the stated interests of traffic safety, property values, and aesthetics, passed a Sign Code regulating, among other things, the size, placement, and spacing of signs, including off-premise signs, which were defined as "any sign advertising a business, person, activity, goods, products or services not usually located on the premises where the sign is installed and maintained, or which directs persons to any location not on the premises." Houston, Tex., Ordinance 80–351 (March 26, 1980). The Sign Code provided for a six-year amortization period, after which the signs must either conform to Code regulations or be removed. *Id.* The Sign Code also contained a provision prohibiting the construction of any new off-premise signs. *Id.*

In 1985, the Texas Legislature passed House Bill 1330 ("HB 1330"),[2] which autho-

---

1. "Amortization," as used in this context, refers to the period of time a city permits a sign that is not in conformance with that city's sign regulations to remain in place for the purpose of allowing the sign owner to recoup its investment.

2. HB 1330 was enacted as article 1015o of the Texas Revised Civil Statutes in 1985, and article 1015o was repealed in 1987. Act of May 31, 1985, 69th Leg., R.S., ch. 221, 1985 Tex. Gen. Laws 1085, *repealed by* Act of May 21, 1987, 70th Leg., R.S., ch. 149, § 49, 1987 Tex. Gen. Laws 1306. Some of the provisions of article 1015o were codified in chapter 216 of the Local Government Code. Act of May 21, 1987, 70th Leg., R.S., ch. 149, 1987 Tex. Gen. Laws 707 (current version at TEX. LOC. GOV'T CODE ANN. § 216.001 (Vernon 1999)). However, certain provisions were not codified because they had been executed before the codification. Other provisions, although not

rized municipalities to require the relocation, reconstruction, or removal of any sign and extended a city's authority over signs into its extraterritorial jurisdiction. Generally, HB 1330 required municipalities to compensate sign owners for such required activities exclusively by cash payment or abatement of municipal property taxes. However, special provisions were made for cities that had in effect on June 1, 1985 an ordinance providing for compensating a sign owner, under an amortization plan, for a sign's relocation, reconstruction, or removal. The amortization provisions of HB 1330 superseded the six-year amortization of the Houston Sign Code. Under the provisions of HB 1330, the sign owner was to file records with the municipal board on sign control indicating those signs that could be brought into conformance at a cost of 15% or less of the sign's value and those signs that could not be brought into conformance at that cost. One-half of the signs that could be brought into conformance for 15% or less of value were to be designated as "bring into conformance" ("BIC"). The other half were to be designated as "permit nonconforming" ("PNC"). BIC signs were to be brought into conformance on a three-year schedule, one-third in each year, at no cost to the city. Sign owners were permitted to keep PNC signs as nonconforming uses with no time limitation.

Signs that could not be brought into conformance for 15% or less of value were designated as "useful life" (UL) signs. The board was to determine the useful life of these signs by type or category and permit the sign to remain in place as a nonconforming use for a period of time, generally 65% of the useful life, under the city's amortization plan. As an alternative, the city could pay the sign owner, in cash or by tax abatement, 65% of the costs of relocation, reconstruction, or removal of the sign.

As a last-minute floor amendment to HB 1330, subsection (k) was added to article 1, section 6. This amendment provided:

> For a sign erected after the effective date of this Act and as to any sign currently in place that is made nonconforming by an extension of or strengthening of an ordinance that was in effect on June 1, 1985, and contained an amortization plan, then the amortization period shall equal useful life as determined by the board in subsection (h)....

Act of May 31, 1985, 69th Leg., R.S., ch. 221, art. 1, § 6, 1985 Tex. Gen. Laws 1085, *repealed by* Act of May 21, 1987, 70th Leg., R.S., ch. 149, § 49, 1987 Tex. Gen. Laws 1306. HB 1330 is now codified as chapter 216 of the Texas Local Government Code. Former subsection 6(k) now reads:

> For a nonconforming sign erected after September 1, 1985, or for a sign in place on that date that later is made nonconforming by an extension of or strengthening of an ordinance that was in effect on June 1, 1985, and that provided an amortization plan, the amortization period is the entire useful life of the sign. If it has not already done so, the board shall determine the entire useful life of signs by type or category, such as mono-pole signs, metal signs, and wood signs. The useful life may not be solely determined by the natural life expectancy of a sign.

TEX. LOC. GOV'T CODE ANN. § 216.012 (Vernon 1999). Houston's board on sign control determined that the useful life of signs

---

codified, have temporary continuing effect either for a specific period or for a period to be determined by the affected municipalities.

*See* TEX. LOC. GOV'T CODE ANN. § 216.012, Revisor's Note (Vernon 1999).

was 17 years for wood structures and 21½ years for steel structures.

In 1987, Patrick Media Group of Houston, Inc. (Eller Media's predecessor in interest) and other members of Harris County Outdoor Advertising Association filed this lawsuit against Houston, alleging that Houston's Sign Code violated the state and federal constitutions and state law. In 1992, Houston amended its Sign Code to declare that all off-premise signs within the city and its extraterritorial jurisdiction were nonconforming and unauthorized. *See* CITY OF HOUSTON BUILDING CODE–GENERAL PROVISIONS § 4619(b) (1994).[3] The amended Sign Code further provided, "The subject signs shall be removed following amortization as provided in Article 1, Section 6(k) of Chapter 221, Acts of the 69th Legislature, Regular Session, 1985." CITY OF HOUSTON BUILDING CODE–GENERAL PROVISIONS § 4619(b). The Sign Code excluded structures "used exclusively ... for messages that do not constitute advertising ... including messages and other copy of a nature that is not commercial advertising because such a structure is not a 'sign'" as defined in the Sign Code. *Id.*, § 4619(c). In addition, the abatement and amortization provisions did not apply to any off-premise sign if those provisions would contravene state or federal law. *Id.*, § 4619(d). Specifically, billboards along the interstate and freeway primary system within the city or its extraterritorial jurisdiction could not be abated by amortization because federal law requires that owners be compensated in cash. The Sign Code also provided as follows:

The provisions of this section shall not be construed to excuse or delay the removal of any off-premise sign that [is] nonconforming under any other provision of this chapter; and it has been the intent of the City Council in adopting this section that each and every off-premise sign within the sign code application area be removed by amortization as soon as permitted by state and federal law.

*Id.*, § 4619(e).

In 1995, Eller Media Company bought the assets of Patrick Media Group of Houston and joined this lawsuit as a plaintiff.[4] The case was tried to the court, which made findings of fact and conclusions of law. Among other things, the trial court concluded (1) the BIC signs were to be brought into compliance and were to be removed after the applicable amortization period; (2) the amortization period for the UL signs had expired and Houston could order their immediate removal; and (3) the PNC signs, under HB 1330, were free from amortization, were not subject to removal, and could exist as nonconforming signs. Judgment was entered in accordance with these conclusions, and Eller Media appealed.

## STANDARD OF REVIEW

 In an appeal of a judgment rendered after a trial to the court, the court's findings of fact have the same weight as a jury's verdict. *Amador v. Berrospe*, 961 S.W.2d 205, 207 (Tex.App.-Houston [1st Dist.] 1996, writ denied). If findings of fact are not challenged, they are binding

---

3. In the trial court and on appeal, the parties have relied on a 1994 publication of the Houston Sign Code, admitted at trial as Plaintiff's Exhibit 3. Neither party has contended that the 1994 publication of the Sign Code varies in any respect from the Sign Code as amended in 1992. Therefore, for the sake of convenience, all references to the Sign Code as amended in 1992 throughout this opinion are to the 1994 version.

4. Eller Media bought the signs owned by Kelly Outdoor Advertising, Inc. in 1997.

on the parties and on this Court. *Cushnie v. State Bar of Texas*, 845 S.W.2d 358, 360 (Tex.App.-Houston [1st Dist.] 1992, writ denied). When challenged, findings of fact are not conclusive if there is a complete reporter's record. *Amador*, 961 S.W.2d at 207. When there is a reporter's record, the trial court's findings of fact are binding only if supported by the evidence. *Id.* If the findings are challenged, the court of appeals will review the legal and factual sufficiency of the evidence supporting the findings. *State Bar of Texas v. Roberts*, 723 S.W.2d 233, 235 (Tex.App.-Houston [1st Dist.] 1986, no writ). In reviewing a no-evidence point, we consider only the evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *Vannerson v. Vannerson*, 857 S.W.2d 659, 666 (Tex.App.-Houston [1st Dist.] 1993, writ denied). If there is any evidence of probative force to support the finding, *i.e.*, more than a mere scintilla, we will overrule the point. *Id.* In reviewing factual sufficiency points of error, we must examine all of the evidence in the record, including any evidence contrary to the judgment, to determine if the challenged finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *Vickery v. Vickery*, 999 S.W.2d 342, 376 (Tex.1999).

The trial court's conclusions of law are not binding on this Court and are reviewed *de novo*. *Connelly v. Paul*, 731 S.W.2d 657, 661 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.).

## DISCUSSION

### I. First Amendment Issues

Houston cites *Metromedia* as the controlling case in the regulation of off-premise billboards in the interests of aesthetics and traffic safety. *See Metromedia, Inc.*

*v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). Eller Media contends that the outcome of this case should not be controlled by *Metromedia*, arguing that *Metromedia* is a four-justice plurality opinion. Eller Media contends that Houston and the trial court incorrectly "cobbled together" portions of the five opinions in *Metromedia* to form a "majority view" that cities may entirely eliminate commercial billboards without violating the First Amendment.

The Supreme Court has explicitly recognized that seven justices in *Metromedia* were of the opinion that San Diego could completely ban billboards for reasons not related to content. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425 n. 20, 113 S.Ct. 1505, 1514 n. 20, 123 L.Ed.2d 99 (1993). We agree with Houston that *Metromedia* controls the issues in this case relating to the regulation of billboards.

### A. Unconstitutional Restriction on Commercial Speech

In four issues, Eller Media complains that the amended Sign Code violates the First Amendment of the United States Constitution. U.S. CONST. amend. I. Eller Media first contends that the Sign Code is an unconstitutional restriction on commercial speech, arguing that the Sign Code fails the third and fourth elements of the *Central Hudson* test. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

*Central Hudson* provides a four-part analysis to be used in determining the validity of restrictions on commercial speech: (1) whether the speech is concerning a lawful activity and is not misleading; (2) whether the restriction seeks to implement a substantial governmental interest; (3) whether the restriction directly advances the governmental

interest; and (4) whether the restriction reaches no further than necessary to accomplish the objective. *See id.*, 447 U.S. at 566, 100 S.Ct. at 2351; *see also Metromedia*, 453 U.S. at 507, 101 S.Ct. at 2892. There is no dispute in this case regarding the first two elements of this test. Houston does not contend that messages on the signs at issue are unlawful or misleading, and Eller Media does not contend that governmental interests in traffic safety and aesthetics are insubstantial. We therefore consider the third and fourth elements. Under the *Central Hudson* test, Houston bears the burden of justifying the challenged restriction as furthering its substantial interest. *See Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 183, 119 S.Ct. 1923, 1930, 144 L.Ed.2d 161 (1999).

**1. Whether the restriction directly advances the interest**

■ Regarding the third element of the *Central Hudson* test, Eller Media argues that the restriction on off-premise signs in the Sign Code does not *significantly*[5] advance the governmental interests of safety and aesthetics because Houston produced no evidence to show a relationship between the existence of billboards and traffic safety and aesthetics. Eller Media directs us to Defendant's Exhibit 32, the 1991 report of the Sign Control Committee as "the only evidence that such a relationship *might* exist." We construe Eller Media's challenge to be one of factual insufficiency to support the trial court's findings of fact numbers 26 and 29, which provide:

26. The City of Houston's determination that a reduction in the number of off-premise billboards enhances the aesthetic appearance and economic prospects of the community is reasonable and supported by the evidence, including Defendant's Exhibit 32.

29. The City of Houston's determination that a reduction in the number of off-premise billboards enhances traffic safety is reasonable and supported by the evidence, including Defendant's Exhibit 32.

In support of its contention that Houston did not carry its burden of demonstrating a relationship between the existence of billboards and traffic accidents or that the reduction of the number of billboards would "significantly" enhance the appearance of Houston, Eller Media cites the testimony of Ned E. Walton, former Associate Professor of Highway Design and Traffic Engineering at Texas A & M University, before the Sign Control Committee, as reported in Defendant's Exhibit 32, which contains the legislative report of the Sign Control Committee on the proposed sign ordinance. Eller Media specifically references Dr. Walton's statement that some research shows a correlation between billboards and traffic safety, while other research does not; that "most of the studies could not withstand rigorous statistical inquiry;" and that "there was no con-

---

5. *Central Hudson* requires that the restriction "directly" advance the governmental interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). Eller Media evidently relies on *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505, 116 S.Ct. 1495, 1509, 134 L.Ed.2d 711 (1996), for its use of the term "significantly." *44 Liquormart* involved a total ban on price advertising for liquor. In that case, the Supreme Court said that "given the drastic nature" of the regulation, "we must determine whether the State has shown that the price advertising ban will *significantly* reduce alcohol consumption." *Id.* *44 Liquormart* is distinguishable because the present case does not involve a total ban on the communication of specific information.

sensus between the highway profession and the outdoor advertising industry that billboards contribute to highway accidents."

The report of the Sign Control Committee contains a 10-page summary of the testimony of several experts and others with some interest in outdoor advertising. According to the report, Dr. Walton also testified that it was hard to provide statistical proof that billboards contribute to highway accidents because rigorous experimental control is virtually impossible. However, he concluded that "any effort that gives drivers a greater margin of safety, including some regulation of off-premise billboards, is protection of the general health, safety, and welfare of the public...." Robert Jilla, assistant director of Houston's Public Works Department and director of the Traffic and Transportation Division, testified to the committee that the Federal Highway Administration has reported a positive correlation between the proliferation of signs along a roadway or at an intersection and the accident rate at the same location. Dr. Helmut Zwahlen, professor of Industrial and Systems Engineering at Ohio University, provided the committee with technical information on human reaction times and said billboards are an added distraction, which may cause longer reaction times and result in drivers' not seeing regulatory and construction signs.

Ed McMahon, Visiting Scholar at the Environmental Law Institute in Washington, D.C., Erin Arber, a registered landscape architect in Texas and chair of the Beautification Committee of the South Montgomery County/Woodlands Chamber of Commerce, and Frank Douglas, President-Elect of the American Institute of Architects, Houston Chapter, testified regarding billboards as they relate to aesthetic appearance and visual pollution, generally testifying that billboards are a major cause of visual pollution. Eller Media presented no evidence to rebut Houston's evidence that billboards cause visual pollution.

The evidence supporting the trial court's findings that a reduction in the number of off-premise billboards enhances the aesthetic appearance of the community and traffic safety is not so weak, and the evidence to the contrary is not so overwhelming, that the findings should be set aside. We hold that Houston has met its burden of establishing that the Sign Code directly advances Houston's interests in reducing traffic accidents and improving the appearance of Houston.

**2. Whether the restriction reaches no further than necessary**

 Eller Media contends that Houston has not satisfied the fourth element of *Central Hudson* because, according to Eller Media, there are other, less restrictive, means by which Houston could address the aesthetic and safety concerns. Eller Media recognizes that Houston "is not required to employ the least restrictive means conceivable, but must demonstrate narrow tailoring of the challenged regulation to the asserted interest—'a fit that is not necessarily perfect, but reasonable.'" *Greater New Orleans Broad.,* 527 U.S. at 188, 119 S.Ct. at 1932 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989)). Nevertheless, Eller Media implies that there are other means that should have been employed.[6] Such an

6. Eller Media argues that "other major cities" have not taken the same action as Houston in both banning new construction of billboards and requiring the removal of existing billboards. The regulations of other cities are irrelevant to the issues in this case, except to

implication is not consistent with Eller Media's recognition that, under *Greater New Orleans Broadcasting,* Houston is not required to use the least restrictive means available. *See id.,* 527 U.S. at 188, 119 S.Ct. at 1932.

Eller Media also argues that the trial court did not apply the "modern *Central Hudson*" test because it did not require Houston to *prove* that the Sign Code would significantly reduce traffic accidents and significantly improve the appearance of Houston and to *prove* that less burdensome means would accomplish Houston's purposes.

Eller Media contends that Houston did not prove that reducing or eliminating billboards would "significantly" enhance the appearance of Houston because, when the Sign Code was passed, there were only 4,372 billboard structures (with 7,120 sign faces) [7] in Houston, compared with 99,966 on-premise signs, many of which were the same size and height as billboards, and, therefore, the effect of removing off-premise billboards would be minimal. Eller Media compares the facts of this case with those in *Discovery Network,* 507 U.S. at 410, 113 S.Ct. at 1505.

In *Discovery Network,* the city granted permits to two commercial publishers to place 62 newsracks on public property for the purpose of distributing commercial handbills. *Id.,* 507 U.S. at 412–13, 113 S.Ct. at 1508. At that time, there were 1500 to 2000 similar newsracks on public property for the distribution of newspapers. *Id.,* 507 U.S. at 414, 113 S.Ct. at 1509. The city later revoked the permits of the commercial publishers, citing the Municipal Code, which completely banned the distribution of commercial handbills.

*Id.,* 507 U.S. at 412–13, 113 S.Ct. at 1508. The city justified this ban as promoting safety and aesthetics. *Id.,* 507 U.S. at 414, 113 S.Ct. at 1509. The Supreme Court determined that there was no basis for treating the newsracks for commercial publications (handbills) and noncommercial publications (newspapers) differently because both presented the same safety and aesthetic problems. *Id.,* 507 U.S. at 428, 113 S.Ct. at 1516. The restriction lacked the necessary "fit" between the city's goals and the means of regulation. *Id.* The Court agreed with the trial court and the court of appeals, which characterized the benefit to be derived from the removal of 62 commercial newsracks while leaving 1500 to 2000 noncommercial newsracks in place as "minute" and "paltry." *Id.,* 507 U.S. at 418, 113 S.Ct. at 1510.

Eller Media argues that the removal of off-premise signs would not make a *significant* improvement in the appearance of Houston when there are so many on-premise signs, and, therefore, Houston has not carried its burden. Eller Media's argument fails because the reasoning of the courts in *Discovery Network* does not apply to the distinction made in our case between off-premise and on-premise signs. On-premise signs serve important functions, including identifying the occupants of the premises and the nature of their businesses or services. The Supreme Court in *Metromedia* determined that cities may, with good reason, make different regulations for off-premise and on-premise signs, including prohibiting off-premise signs while permitting on-premise signs. *See Metromedia,* 453 U.S. at 512, 101 S.Ct. at 2895.

---

the extent that they have been litigated and provide us with some guidance, such as in *Metromedia.*

7. Eller Media does not indicate how many of these billboards are actually subject to amortization under the Sign Code.

Under the fourth prong of the *Central Hudson* test, Houston was required to show that the regulation reached no further than necessary to accomplish its objective. *See Metromedia,* 453 U.S. at 507, 101 S.Ct. at 2892. With respect to the fourth prong, the court in *Metromedia* said:

> If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs.

*Id.,* 453 U.S. at 508, 101 S.Ct. at 2893. Houston, like San Diego, has gone no further than necessary to accomplish its purpose. Houston has, therefore, satisfied the fourth prong of the *Central Hudson* test.

We conclude that the Sign Code is not an unconstitutional restriction on commercial speech. Accordingly, we overrule Eller Media's first issue.

**B. Inadequate Alternate Channels of Communication**

 Eller Media also contends that the Sign Code violates the First Amendment because it leaves small businesses and public service organizations with inadequate channels to communicate their messages. Eller Media argues that the smaller, poster-style billboards, which tend to be used by small businesses and public service organizations, would be disproportionately affected by the code.

Eller Media argues that, when a regulation forecloses an entire medium of expres-sion, there must be alternative channels of communication that "provide *realistic* and *adequate* media" to communicate the speaker's message, citing *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), and *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977).

These cases are clearly distinguishable from the present case. In *Gilleo,* the medium of expression at issue involved signs in residential front yards. 512 U.S. at 45, 114 S.Ct. at 2040. A city ordinance prevented Gilleo from placing a sign in her yard with the message, "Say No to War in the Persian Gulf." *Id.* The Court stated:

> Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else.... Precisely because of their location, such signs provide information about the identity of the "speaker."

*Id.,* 512 U.S. at 56, 114 S.Ct. at 2046. In a footnote, the Court references *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 772 n. 24, 96 S.Ct. 1817, 1831 n. 24, 48 L.Ed.2d 346 (1976), which states, "Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely." *Gilleo,* 512 U.S. at 57 n. 15, 114 S.Ct. at 2046 n. 15.

The issue in *Linmark Associates* was a prohibition of "For Sale" signs in residential front yards to stem a perceived flight of white homeowners from an integrated neighborhood. 431 U.S. at 86, 97 S.Ct. at 1615. The Supreme Court questioned whether there were satisfactory alternative methods of communicating the information conveyed by a "For Sale" sign in front of a house. *Id.,* 431 U.S. at 93, 97 S.Ct. at 1618. The Court also pointed out that the regulation was content-based, not

a place or manner restriction, because other types of signs were not barred. *Id.*, 431 U.S. at 93–94, 97 S.Ct. at 1619. The Court determined that the ordinance was constitutionally defective because the City Council sought to restrict the free flow of information "because it fears that otherwise homeowners will make decisions inimical to what the Council views as the homeowners' self-interest and the corporate interest of the township: they will choose to leave town." *Id.*, 431 U.S. at 96, 97 S.Ct. at 1620.

Eller Media's concern for public service organizations' lack of communication channels is also misplaced. Because public service organizations' messages would constitute noncommercial speech, Eller Media is free to maintain billboards exclusively, at all times, for their use because the Sign Code specifically excludes such structures from its regulations.

We overrule Eller Media's second issue.

**C. Content-based Distinctions Between Types of Noncommercial Speech**

■ Eller Media contends the Sign Code makes content-based distinctions among types of noncommercial speech. Eller Media suggests that the definition of "advertising" includes noncommercial speech. Presumably, Eller Media is arguing that a sign could "seek the attraction of or ... direct the attention of the public to goods, services or merchandise" of a noncommercial nature. If so, such "advertising" would remain noncommercial speech.

The trial court found, in finding of fact number 31, that

Section 4619 regulates commercial speech only and not other forms of speech. The preamble to Ordinance 92–36 provides that "the Sign Ordinance was never intended to regulate ideological, political or other non-commercial

speech" and the City Council desires to clearly limit the application of the Sign Ordinance, as strengthened, to "commercial signs." The word "advertising" in Section 4619 contemplates commercial speech only.

In addition to the preamble quoted in the court's finding, the Sign Code provides the following exclusion:

The provisions of this section shall not be construed to require the removal of a structure that is used exclusively and at all times ... for messages that do not constitute advertising, including, but not limited to, political messages, religious or church related messages, public service, governmental and ideological messages and other copy *of a nature that is not commercial advertising* because such a structure is not a "sign" ..., as that term is defined, for purposes of this chapter and is not subject to regulation under this chapter.

CITY OF HOUSTON BUILDING CODE—GENERAL PROVISIONS § 4619(c) (emphasis added). Thus, a "sign" that "advertises" a noncommercial message falls under the exclusion, and the Sign Code does not make content-based distinctions between types of noncommercial speech.

We overrule Eller Media's third issue.

**D. Unfettered Discretion of Sign Administrator**

■ Eller Media also complains that the Sign Code gives unfettered discretion to a sign administrator to determine the legality of a billboard based upon the content of its message. Eller Media argues that the Sign Code's definition of "advertising" is ambiguous, thus placing substantial discretion in the hands of the administrator.

The Sign Code defines "advertising" as follows:

**Advertising** shall mean to seek the attraction of or to direct the attention of the public to any goods, services or merchandise whatsoever.

City of Houston Building Code—General Provisions § 4602. When considered in conjunction with the exclusion for messages that are not commercial advertising, we do not find the definition of advertising to be ambiguous.

Eller Media cites *Desert Outdoor Advertising, Inc. v. City of Moreno Valley,* 103 F.3d 814 (9th Cir.1996), as an example of an ordinance found to be unconstitutional because it granted discretion to deny a permit on the basis of ambiguous and subjective reasons. In *Desert Outdoor,* issuance of a permit to erect an off-site sign was subject to a finding that the sign "will not have a harmful effect upon the health or welfare of the general public and will not be detrimental to the welfare of the general public and will not be detrimental to the aesthetic quality of the community or the surrounding land uses." *Id.* at 818. The court concluded that the permit requirement was unconstitutional because it gave city officials "unbridled discretion in determining whether a particular structure or sign will be harmful to the community's health, welfare, or 'aesthetic quality.'" *Id.* at 819.

Eller Media contends that the power and authority granted to the sign administrator "to administer and enforce the terms and conditions" of the Sign Code, to inspect and approve signs, "to revoke any and all licenses or permits," and "to adopt regulations required to implement the provisions of" the Sign Code is evidence of the administrator's "substantial discretion" and "substantial power." Eller Media does not address the fact that *all* the administrator's power and authority is in relation to administering and enforcing the terms and conditions of the Sign Code.

The responsibility of the sign administrator is set out in the Sign Code:

[T]o administer and enforce the terms and conditions of this chapter and all other provisions of law relating to signs.... [T]o enforce and carry out all provisions of this chapter.

City of Houston Building Code—General Provisions § 4604(a). Furthermore, the decisions of the sign administrator are subject to an appeal process, first to the General Appeals Board, then to City Council. City of Houston Building Code—General Provisions § 4604(e). Regulation without some means of enforcement would be meaningless.

We hold that the discretion of the sign administrator is not "unfettered." Accordingly, we overrule Eller Media's fourth issue.

## II. Unconstitutional Taking

██ In its fifth issue, Eller Media contends that the amortization scheme in the Sign Code results in an unconstitutional "taking" without just compensation. To support its contention, Eller Media argues that the trial court improperly relied on *City of University Park v. Benners,* 485 S.W.2d 773 (Tex.1972), and failed to make the correct "regulatory taking" analysis under *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

██ A taking generally involves the government's taking ownership or possession of a person's property for public use or imposing regulations on the property that render it valueless. Such takings, under both the United States Constitution and the Texas Constitution, must be compensated. The Fifth Amendment of the United States Constitution does not mention the type of compensation, but federal case law generally requires monetary com-

pensation. *See* U.S. CONST. amend. V ("nor shall private property be taken for public use, without just compensation"); *see also, e.g., United States v. Reynolds,* 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970); *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). The Texas Constitution specifically provides that the compensation be monetary. TEX. CONST. art. I, § 17 ("when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money").

When the government imposes regulations that restrict the use of property, but do not interfere with the ownership or possession by the owner and do not render the property valueless, a taking does not necessarily occur, and any resulting economic loss to the owner does not necessarily require compensation. *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 138, 98 S.Ct. 2646, 2666, 57 L.Ed.2d 631 (1978). Such regulations may be an exercise of governmental police powers, and amortization is a valid technique to allow owners of property to recoup their investment in property that becomes nonconforming as a result of the regulations. *See Benners,* 485 S.W.2d at 779.

In *Penn Central,* the Landmarks Preservation Commission had designated the Grand Central Terminal, owned by Penn Central Transportation Co. and its affiliates, as a "landmark." *Penn Central,* 438 U.S. at 116, 98 S.Ct. at 2655. Because the terminal was a landmark, the owners were required to obtain the Commission's approval of any exterior alterations to the building. *Id.,* 438 U.S. at 112, 98 S.Ct. at 2653. The issue in *Penn Central* was whether the Commission's rejection of Penn Central's plan for constructing a multistory office building over the terminal was a taking without just compensation in

violation of the Fifth and Fourteenth Amendments. *Id.,* 438 U.S. at 117, 119, 98 S.Ct. at 2655–56. The Court stated that factors of significance to be considered in determining whether a regulation constitutes a taking include (1) the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations and (2) the character of the governmental action. *Id.,* 438 U.S. at 124, 98 S.Ct. at 2659. The Court said, "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government … than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good (internal citation omitted)." *Id.*

The Court cited numerous examples of regulations that diminish property values without requiring compensation. These examples included the exercise of taxing power, the creation of zoning laws, the prohibition of industrial use, the requirement that parcels of land be left unimproved, and the placing of height restrictions on building. *Id.,* 438 U.S. at 124–25, 98 S.Ct. at 2659–60. The Court also cited examples of the termination of existing uses without compensation for loss: cutting cedar trees to save apple trees, terminating use as a brickyard, closing a gold mine to make workers available for more necessary mining, requiring a railroad to share grade-improvement costs, prohibiting the manufacture of carbon black, prohibiting the operation of a livery stable, prohibiting a liquor business, and banning certain excavation so that a sand and gravel mining business was effectively prohibited. *Id.,* 438 U.S. at 126–27, 98 S.Ct. at 2660.

The Court in *Penn Central* considered the theme of the law at issue—reasonable

return on investment—in reaching its conclusion that the regulation in that case was not a taking. *Id.,* 438 U.S. at 110, 98 S.Ct. at 2652. The Court found that the restrictions were substantially related to the promotion of the general welfare, permitted reasonable, beneficial use of the site, and afforded owners opportunities to enhance the site and also to enhance other properties through the transfer of air-space rights to those other properties. *Id.,* 438 U.S. at 138, 98 S.Ct. at 2666.

Texas case law is consistent with the principles of *Penn Central.*

In *City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802 (Tex. 1984), the court reiterated its refusal to establish a bright line for distinguishing between an exercise of police power that constitutes a taking and one that does not. *Id.* at 804 (citing *City of Austin v. Teague,* 570 S.W.2d 389, 391 (Tex.1978), and *DuPuy v. City of Waco,* 396 S.W.2d 103, 107 (Tex.1965)). Whether a police-power regulation results in a taking is a question of law. *Id.* at 805. To be an exercise of police power that does not constitute a taking, the regulation (1) must be adopted to accomplish a legitimate goal—must be substantially related to health, safety, or general welfare of the people—and (2) must be reasonable, not arbitrary. *Id.* "If reasonable minds may differ as to whether or not a particular zoning ordinance has a substantial relationship to the public health, safety, morals, or general welfare ... the ordinance must stand as a valid exercise of the city's policy power." *Id.* (quoting *Hunt v. City of San Antonio,* 462 S.W.2d 536, 539 (Tex.1971)).

In *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922 (Tex.1998), the Texas Supreme Court recognized that takings can be either physical or regulatory. *Id.* at 933. The plaintiffs had contended that the

Town's denial of the plaintiffs' development proposal to build 3,600 housing units was a taking of their property without just compensation. *Id.* at 926. The supreme court stated the general rule that application of a general zoning law to a particular property is a regulatory taking if the ordinance "does not substantially advance legitimate state interest" or if the ordinance denies an owner all "economically viable use of his land." *Id.* at 933 (citing *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). The court relied on *Penn Central* and other Supreme Court and Texas opinions in its reasoning: property regulation must "substantially advance" a legitimate governmental interest to pass constitutional muster; if the regulation does not, it is a taking. *Id.* at 934. If the regulation does, then the court must determine whether the regulation (1) denies the owner all economically viable use of the property or (2) unreasonably interferes with the owner's rights to use and enjoy the property. *Id.* at 935. Under the first factor, the court must determine whether value remains in the property after the governmental action. *Id.* Under the second, the court must consider the economic impact of the regulation and the extent to which the regulation interferes with investment-backed expectations. *Id.*

In *Mayhew,* there was no compensable regulatory taking because the owner's land still had value, and the owners, having originally purchased the land for ranching, had no reasonable investment-backed expectation to build 3,600 housing units on the land. *Id.* at 937–38.

The Texas Supreme Court introduced the concept of amortization as a valid technique to terminate nonconforming property uses in *Benners,* 485 S.W.2d 773 (Tex.

1972).[8] The court recognized amortization as a proper method of allowing a property owner to recoup his investment before the government required the termination of a use made nonconforming by the institution of a regulation. *Id.* at 777–78.

In *Benners,* the city passed a zoning ordinance in 1940 that effectively terminated the commercial use of two lots that had been used for commercial purposes since 1925. *Id.* at 775. The ordinance provided that any nonconforming use must be removed or converted to a conforming use prior to January 1, 1965. *Id.* The owner of the two lots complained that this was a taking without compensation. *Id.* at 776. The court considered rulings in other jurisdictions on the issue of the power of municipalities to require termination of existing uses of property made nonconforming by zoning regulations and noted that the prevailing view recognized the use of amortization as a valid exercise of its police power. *Id.* at 777. The court stated,

> The usual approach rests on the principle that there is not a legally significant difference between existing and prospective uses in land; and that the required termination of a pre-existing land use, with allowance for recoupment, is no different in kind from restrictions upon future land use alternatives. So it is concluded that termination does not constitute a 'taking' in the eminent domain sense but an exercise of the police power in the public interest; and that such an enactment is subject to the same tests of validity as other legislative acts, i.e., whether it is reasonable and

bears a fair relationship to the object sought to be obtained.

*Id.* at 777–78. The court continued,

> We are in accord with the principle that municipal zoning ordinances requiring the termination of nonconforming uses under reasonable conditions are within the scope of municipal police power; and that property owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made. Otherwise, a lawful exercise of the police power by the governing body of the City would be precluded.

*Id.* at 778. The court reasoned that the owner of the nonconforming, terminated use, after being given the opportunity to recover his investment in that property, would be placed in the equivalent position of the owner of property on which future use was restricted. *Id.* at 779. The court noted that, in the *Benners* case, the owner had 25 years notice that the nonconforming use would have to terminate. The court determined that this was sufficient time to recoup any loss in property value caused by the zoning ordinance. *Id.*

Following *Benners,* Texas courts have consistently held that amortization is a valid technique to allow owners of property to recoup their investment in property that became nonconforming as a result of a city's exercise of its police power. *See, e.g., Bd. of Adjustment v. Patel,* 887 S.W.2d 90, 93 (Tex.App.-Texarkana 1994, writ denied) (period of amortization to be determined by amount of investment at time motel became nonconforming); *Bd. of*

---

**8.** Two pre-*Benners* cases, without citation to any authority, referred to amortization as allowing owners to recoup their investment in nonconforming property. *See City of Garland v. Valley Oil Co.,* 482 S.W.2d 342, 346 (Tex. Civ.App.-Dallas 1972, writ ref'd n.r.e.); *Swain v. Bd. of Adjustment,* 433 S.W.2d 727, 735 (Tex.Civ.App.-Dallas 1968, writ ref'd n.r.e.).

The *Benners* court did not rely on these cases; rather, it joined the "prevailing view," citing a case from the Fifth Circuit Court of Appeals and cases out of California, Illinois, Iowa, Kansas, Maryland, Minnesota, Nebraska, New Hampshire, New York, and Washington. *City of Univ. Park v. Benners,* 485 S.W.2d 773, 777 (Tex.1972)

*Adjustment v. Patel,* 882 S.W.2d 87, 89–90 (Tex.App.-Amarillo 1994, writ denied) (same); *Bd. of Adjustment v. Winkles,* 832 S.W.2d 803, 806 (Tex.App.-Dallas 1992, writ denied) (increase in inventory after business became nonconforming does not increase period of amortization); *Williams v. City of Fort Worth,* 782 S.W.2d 290, 294 (Tex.App.-Fort Worth 1989, writ denied) (recognizing amortization as a valid method of forcing property owners to comply with zoning restrictions); *City of Houston v. Harris County Outdoor Adver.,* 732 S.W.2d 42, 49–50 (Tex.App.-Houston [14th Dist.] 1987, no writ) (same); *Neighborhood Comm. on Lead Pollution v. Bd. of Adjustment,* 728 S.W.2d 64, 71 (Tex.App.-Dallas 1987, writ ref'd n.r.e.) (period of amortization determined by investment remaining at time property becomes nonconforming); *Murmur Corp. v. Bd. of Adjustment,* 718 S.W.2d 790, 797–98 (Tex.App.-Dallas 1986, writ ref'd n.r.e.) (defining "full value" for recoupment purposes as owner's actual investment in nonconforming use at the time of the zoning change); *Lubbock Poster Co. v. City of Lubbock,* 569 S.W.2d 935, 945–46 (Tex.App.-Amarillo 1978, writ ref'd n.r.e.) (amortization is a valid method for recouping investment).

These cases generally recognized zoning and other regulation of property as an exercise of a city's police power, and they defined the investment recouped through amortization as the investment remaining at the time the property became nonconforming, but did not include any investment made in the property at a later time. *See Winkles,* 832 S.W.2d at 806; *Neighborhood Comm.,* 728 S.W.2d at 71.

In the present case, the trial testimony established that the purchase price of a billboard was, on an average, 10 times the annual cash flow. The amortization periods of 17 years and 21½ years for the BIC signs began in 1992. These amortization periods allowed more than enough time for the owners to recoup their investment and to make additional profits. Eller Media, knowing of the amortization scheme of the Sign Code, purchased Patrick Media Group's assets in 1995 and additional signs in 1997. The president of the Houston branch of Eller Media testified that the price it paid for Patrick Media was not discounted because of the amortization scheme. However, at the time of the purchase, there were 14 years of use remaining for wood structures and 18 years remaining for steel structures. The trial court found, in finding of fact number 36, "Plaintiffs presented no credible evidence to show that they will be unable to recoup their initial investment and a rate of return in any billboard subject to removal by amortization." That finding has not been challenged on appeal.

We hold that the regulations in the Sign Code are a reasonable exercise of the City's police power and are not a compensable taking. We further hold that the amortization periods of 17 years and 21½ years permitted by the Sign Code are sufficient for Eller Media to recoup its investment.[9] Accordingly, we overrule Eller Media's fifth issue.

### III. Conflict with HB 1330

■ In its sixth issue, Eller Media contends that the Sign Code is in conflict with HB 1330. Eller Media argues that the purpose of HB 1330, as shown in its legislative history, was to institute a statewide ban on amortization of billboards. On the other hand, Houston contends the "entire

---

9. We note that, under the cited case law, Eller Media is entitled to recoup only that investment of its predecessor remaining at the time the Sign Code was passed. However, that issue has not been brought before this Court.

framework of H.B. 1330 was designed to create different regulatory authority" between cities that had pre-existing amortization plans and those that did not. Both sides reference the legislative history as seen in remarks before the Senate State Affairs Committee. The legislative history clearly shows that, in considering the Bill, the committee worked out a compromise between a total ban on amortization and the needs of those cities with an amortization scheme already in place.

However, we need not rely on legislative history, because the statute is neither vague nor ambiguous. HB 1330 provides generally for only two methods of compensation for the relocation, reconstruction, or removal of signs: monetary or tax abatement. Special provisions are made for those cities with an ordinance existing on June 1, 1985 providing for compensation through an amortization plan. Those special provisions include a subsection, added as a floor amendment, clarifying that the special provisions are applicable to signs erected after the effective date of the enactment of HB 1330 and are also applicable to signs made nonconforming by an extension or strengthening of the city ordinance.

Eller Media argues, without authority, that the word "strengthening" in HB 1330 "should be interpreted to mean changing an ordinance so that it applies to *types* of signs that were not regulated as of June 1, 1985, but were located within the city limits." We see no basis for such a narrow construction of "strengthening," nor do we think "strengthening" is a term of art in need of construction. HB 1330 clearly contemplates the ordinary meaning of "strengthening," *i.e.,* "to make or become strong or stronger." *See* WEBSTER's II: NEW COLLEGE DICTIONARY 1091 (1995).

We hold that the Houston Sign Code is not in conflict with HB 1330. Accordingly, we overrule Eller Media's sixth issue.

## IV. Removal of UL Billboards

■■■ In its seventh issue, Eller Media contends that the trial court erroneously ruled that Houston may order the immediate removal of all UL signs. Eller Media challenges the findings of the trial court that HB 1330 *requires* the removal of UL billboards after 65% of their useful life. Eller Media correctly argues that HB 1330 does not require the removal of any signs. HB 1330 expresses the legislative intent neither to require nor to prevent the relocation, reconstruction, or removal of any sign in a municipality. Section 6 of HB 1330 applies only to those cities that had adopted amortization before June 1, 1985. Section 6 creates a category of signs designated as UL and provides the amortization schedule for those signs. It does not say what happens at the end of the amortization period. Either bringing the UL billboards into compliance or removing them would be consistent with the language of Section 6.

Eller Media also argues that the Sign Code does not require the removal of any signs before 2009 or 2013—the same schedule as the BIC signs (the only other category of signs to be removed). This argument has no merit. In section 4619(e), entitled "Previously Nonconforming Signs," the Sign Code provides:

> The provisions of this section shall not be construed to excuse or delay the removal of any off-premise sign that [is] nonconforming under any other provision of this chapter; and it has been the intent of the City Council in adopting this section that each and every off-premise sign within the sign code application area be removed by amortization

**686**

*as soon as permitted by state and federal law.*

CITY OF HOUSTON BUILDING CODE—GENERAL PROVISIONS § 4619(e) (emphasis added). Eller Media does not address section 4619(e) of the Sign Code in its brief.

We conclude that, under section 4619(e), the UL signs remain under the amortization schedule as provided in HB 1330, effective September 1, 1985.[10] HB 1330 does not prevent the removal of the UL billboards, and the Sign Code requires their removal.

We hold that the judgment correctly permits Houston to order the immediate removal of all UL signs. Accordingly, we overrule Eller Media's seventh issue.

We affirm the judgment.

10. The amortization schedule for the UL billboards began in 1985 with the enactment of HB 1330. The amortization schedule for the BIC billboards began in 1992 when Houston amended its Sign Code.