NEIGHBORHOOD COMMITTEE ON LEAD POLLUTION, et al., Appellants,

v.

The BOARD OF ADJUSTMENT OF the CITY OF DALLAS, Appellee.

DIXIE METALS COMPANY, Appellants,

v.

The BOARD OF ADJUSTMENT OF the CITY OF DALLAS, Appellee.

No. 05–86–00198–CV.

Court of Appeals of Texas, Dallas.

Feb. 27, 1987.

Rehearing Denied April 15, 1987.

Kenneth L. Schorr, Joe K. Crews, Dallas, for appellants.

Thomas C. Unis, Kenneth S. Beat, P. Michael Jung, Analeslie Muncy, City Atty., Carroll R. Graham, Donald R. Postell, Dallas, for appellee.

Before GUITTARD, C.J., and McCLUNG and McKAY,[1] JJ.

GUITTARD, Chief Justice.

The Neighborhood Committee on Lead Pollution and others initiated a proceeding before the Board of Adjustment of the City of Dallas to terminate the lead smelting operation of Dixie Metals Company as a nonconforming use. The Board issued an order on October 30, 1984, requiring termination of the smelting operation on December 31, 1990. On review by certiorari, a district court of Dallas County affirmed the order. Both the Neighborhood Committee and Dixie Metals have appealed to this court. We affirm the judgment of the district court.

*Jurisdiction of the District Court*

The Board asserts that the district court had no jurisdiction of this proceeding because neither the Neighborhood Committee nor Dixie Metals "presented" a petition for a writ of certiorari to the district court within ten days after the filing of the decision in the office of the Board, as required by article 1011g(j) of the Texas Revised Civil Statutes (Vernon Supp.1986). Our record shows that both petitions were filed with the clerk of the district court within ten days of the filing of the Board's order, but does not show that either petition was brought to the judge's attention within that time.

■ We note that the statute does not contain any other provision as to when a

petition for certiorari should be filed with the clerk of the district court. We conclude that in the absence of any other provision prescribing the time for filing, article 1011g(j) requires the petition to be filed within ten days after the filing of the Board's order, and that this provision does not require that the petition be called to the judge's attention within that time.

Dixie Metals also challenges the jurisdiction of the district court to entertain the petition of the Neighborhood Committee on the ground that no writ of certiorari was ever issued and served in the Committee's appeal as ordered by the judge pursuant to article 1011g(k). In support of this argument, Dixie Metals cites the holding in *City of Lubbock v. Bounds*, 623 S.W.2d 752, 755 (Tex.App.—Amarillo 1981, no writ), that the district court has no jurisdiction without service and return of the writ because it has no record to review by certiorari until the writ has been issued and served on the board and the board has made its return on all the papers and factual matters before it, as provided by article 1011g(*l*).

We conclude that the *Bounds* holding does not apply here because our record shows that the Board was in fact served with a writ at the instance of Dixie Metals and did make the return required by the statute. When more than one party seeks review of the Board's order, no useful purpose would be served by serving two writs of certiorari on the Board and requiring the Board to certify the same record twice. Moreover, if we should apply the *Bounds* holding here and remand the Committee's appeal for further proceedings, the Board, presumably, would certify the same record again and the district court would reach the same conclusion, so that the only result would be delay.

■ We hold, therefore, that when a writ of certiorari has been issued by the district court and served on the Board, and the Board has made a proper return certifying the record of the matters presented

1. The Honorable Connally McKay, Justice, Court of Appeals for the Twelfth District of Texas at Tyler, Retired, sitting by appointment.

to it, the requirements of article 1011g(k) and (*l*) are satisfied with respect to all parties that have filed timely petitions pursuant to article 1011g(j). Consequently, we hold that the district court had jurisdiction to review the Board's decision in the light of the contentions of all the parties.

### Appeal of the Neighborhood Committee

The Neighborhood Committee contends that the district court erred in affirming the Board's order allowing continued operation of the lead smelter until December 31, 1990, because there is no evidence of any investment by Dixie Metals at the time of the zoning change. The Committee asserts that in the absence of such evidence, the Board is required to order immediate termination of the nonconforming use. We do not agree.

The Board's authority to terminate a nonconforming use is found in the following provisions of the Dallas Development Code:

SEC. 51–3.102 BOARD OF ADJUSTMENT

(c) *Powers and Duties.* The board has the following powers and duties which must be exercised in accordance with this chapter:

&ast; &ast; &ast; &ast; &ast; &ast;

(4) to bring about the discontinuance of a non-conforming use under a plan whereby the full value of the structure can be amortized within a definite time period;

SEC. 51–4.704. NON–CONFORMING USES AND STRUCTURES.

(a) *Termination of non-conforming uses.*

(1) The board shall provide a termination date for non-conforming uses having due regard for the investment in the non-conforming use.

Recently these provisions were before us in *Murmur Corporation v. Board of Adjustment,* 718 S.W.2d 790 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), in which we held that the Board must find facts as the basis of any administrative order terminating a nonconforming use and, therefore, bears the burden of proof to present substantial evidence supporting such an order. We held further in *Murmur* that an order of termination is not authorized in the absence of substantial evidence that the landowner has no actual investment in the nonconforming use. However, the only parties to that proceeding were the Board and the landowner. In the present case the committee insists that other interested persons ought not to have the burden to prove the amount of the landowner's investment in the nonconforming use because they have no access to the relevant information, which is solely in the possession of the landowner.

■ We adhere to our holding in *Murmur,* and hold here that the burden is on the Board and other interested parties to present evidence of the owner's investment in the nonconforming use as a basis for an administrative order of termination. To discharge this burden, the Board is given the power of subpoena, which is available at the instance of any party. Dallas City Code, § 2–8. Accordingly, we hold that even if none of the evidence offered by the Board or by Dixie Metals is sufficient to establish Dixie Metals's investment in the nonconforming use, the Board was not required to order immediate termination. Therefore, we overrule the committee's attack based on insufficiency of the evidence to support any period of continuation of the amortization period.

■ The Neighborhood Committee also contends that the procedure before the Board was fundamentally unfair because it did not have enough time to challenge Dixie Metals' disclosures, which were not filed with the Board until two days before the hearing and were not made available to the committee until the day of the hearing. The committee also complains that Dixie Metals' evidence was in the form of affidavits and a written valuation report that deprived the committee of any opportunity to cross-examine. Dixie Metals and the City point out that the committee made no objection to the form of Dixie Metals' evidence and made no request for a continuance to allow the committee more time to prepare. They also assert that the commit-

tee made no request to call the affiants as witnesses for the purpose of cross-examination. We conclude that the record fails to show that the hearing was fundamentally unfair. Although the committee initiated the proceeding, it presented no valuation evidence, apparently relying on its theory that Dixie Metals had the burden of presenting evidence to justify continued operation of the smelter. As we have already held, in such an administrative proceeding, the parties seeking termination have the burden of proof.

For the reasons stated, we overrule all the contentions of the Neighborhood Committee.

### Appeal of Dixie Metals

Dixie Metals attacks the Board's order on several grounds, some of which were considered and determined adversely to the company's position in *Murmur*. We adhere to our rulings in *Murmur* and conclude that none of the company's remaining contentions are well taken.

### 1. *Nonconforming Use*

On several grounds Dixie Metals asserts that the lead-smelting operation is not a nonconforming use subject to termination. It attacks the validity of the ordinance to require a specific-use permit for lack of notice, the same ground as that we rejected in *Murmur*, and we reject the attack here for the same reason—legislative validation. *Murmur*, 718 S.W.2d at 792–93. Dixie Metals also contends that its lead-smelting operation is not a nonconforming use because the ordinance does not require a specific-use permit. We do not agree.

The pertinent provision of the ordinance is section 51–4.216(13) of the Dallas Development Code under which a specific-use permit is required for a "facility for the smelting and plating of metals" in an Industrial-3 zoning district. Dixie Metals argues that since its operation includes smelting but not plating, its property is not "a smelting *and plating* facility."

The City argues that "and" in this instance must be interpreted as synonymous with "or" because these conjunctions are frequently used interchangeably in the Dallas Development Code. We agree. Although "and" is conjunctive and "or" is disjunctive, and, therefore, the two are not usually interchangeable, they are interpreted as synonymous when the context so requires in order to give effect to the manifest intent. *Board of Insurance Commissioners v. Guardian Life Insurance Co.*, 142 Tex. 630, 180 S.W.2d 906 (1944).

However, we need not interpret "and" as completely synonymous with "or" in section 51–4.216(13) in order to construe this section as requiring a specific-use permit for smelting apart from plating. One of the recognized usages of "and" is to refer to "either or both" of two alternatives, when "or" might be interpreted as referring to only one or the other. This usage is listed as one of the meanings of "and" in Webster's New International Dictionary, Second Edition (1945) as follows:

> f Reference to either or both of two alternatives. "Which he would not like you *and* me to peep into." *Thackeray.* In legal language *and* is interpreted as if it were *or,* and vice versa, whenever this construction is plainly required to give effect to the intention of the person using it; thus, in a bequest to "a person *and* her bodily issue," or in a law providing that certain cities may tax property "taxable for State *and* county purposes," *and* may be read as *or.* Sometimes in legal papers *and/or* is used to represent *and* as interchangeable with *or.*

This usage of "and" in the sense of "either or both," or "any and all" when more than two items are named, is used frequently in the Dallas Development Code, as the following examples demonstrate:

[Section 51–4.215(1):]

growing farm products or keeping farm poultry *and* farm livestock;

[Section 51–4.215(2):]

prevention, treatment, cure or alleviation of disease *and* injury in animals;

[Section 51–4.216(5):]

fabrication of swimming pools from fiberglass *and* other similar materials;
[Section 51–4.216(8):]
manufacturing of bedspreads, drapes, headboards, *and* similar bedding materials;
[Section 51–4.216(9):]
compounding of products such as perfumes, pharmaceuticals, *and* the development *and* assembly of instruments *and* similar items;
[Section 51–4.216(12):]
manufacturing, processing *and* storage of tread rubber.

(Emphasis added.)

██ It would be manifestly contrary to the legislative intent to interpret these and other provisions of the Code as applying only when all the items named in each provision occur together because of the conjunction "and." Consequently, in the absence of any evidence in the record indicating that smelting might be considered a problem only when accompanied by plating, or vice versa, we construe section 51–4.216(13) as requiring specific-use permits for both smelting of metals *and* plating of metals—not to smelting only when accompanied by plating or vice versa.

Dixie Metals further contends, alternatively, that section 51–4.216(13) does not require a specific-use permit for its smelter operations because that operation falls within other provisions of the Code allowing uses in districts designated Industrial–3 without requiring such permits. The other provisions referred to are as follows: (1) a "metal processing facility," defined as "a facility that collects, separates, and processes scrap metal in bulk form for reuse and manufacturing," § 51–4.214(6); (2) "outside salvage or reclamation," defined as "a facility which stores, keeps, dismantles, or salvages scrap or discarded material or equipment outside," (including metal) § 51–4.214(5); (3) "inside salvage and reclamation," defined the same except that it applies to operations conducted "wholly inside a building," § 51–4.214(7).

██ Dixie Metals argues that since its operations fall into these categories not requiring a specific-use permit as well as "smelting" within section 51–4.216(13), the more permissive classification should be applied. This argument does not persuade us. Its effect would be practically to nullify altogether the requirement of a specific-use permit in section 51–4.216(13), except with respect to ore smelting, because "smelting" of scrap metal is necessarily a subcategory of "metal processing" in section 51–4.214(6). This result obviously frustrates the legislative intent. If the city council had intended to require such a permit only for ore smelting, as distinguished from scrap-metal smelting, it could easily have so provided. The applicable principle is rather the well-known rule that the specific controls the general. *Woodyard v. Hunt,* 695 S.W.2d 730 (Tex.App.—Houston [1st Dist.] 1985, no writ); *Smith v. Chase,* 405 S.W.2d 450 (Tex.Civ.App.—Dallas 1966, writ ref'd n.r.e.) Although no specific-use permit is required for "metal processing" of scrap metals in general, section 51–4.216(13) specifically requires such a permit for two particular types of metal processing: "smelting and plating of metals." We find no ambiguity in the ordinance in this respect. Consequently, we reject all of Dixie Metals' arguments asserting that the Code does not require a specific-use permit for "smelting and plating of metals."

Dixie Metals also contends that its smelting operation is an industrial use other than listed, as defined by section 51–4.216(1) of the Code, and, therefore, is permitted by right in an Industrial–3 zoning district. The company does not assert that "smelting and plating of metals" is not listed; consequently this argument is evidently based on its previous contention that its operation is not included in "smelting and plating of metals." We reject this contention on the grounds previously stated.

#### 2. *Amortization*

Dixie Metals' remaining contentions challenge on various grounds the amortization period allowed by the Board. Although denying the Board's authority to terminate the smelting operations as a nonconforming use, Dixie Metals asserts alternatively

that the Board is required by sections 51–3.102(c)(4) and 51–4.704(a)(1) of the Dallas Development Code to set a termination date under a plan whereby the full value of the nonconforming structure is amortized within a definite period of time, with due regard to Dixie Metals' investment in the nonconforming use. Dixie Metals argues that the Board exceeded its power in fixing a termination date of December 31, 1990, for several reasons.

Dixie Metals first contends that the Board exceeded its powers because its plan of amortization did not allow Dixie Metals time to recover the full market value of its nonconforming facilities. We reject this contention for the reasons stated in our opinion in *Murmur*, 718 S.W.2d at 795–97.

Dixie Metals next contends that the "plan of amortization" authorized by section 51–3.102(c)(4) necessarily requires a prospective period of amortization, not a period beginning before the date of the Board's termination order. Dixie Metals argues that since the ordinance does not in itself fix a definite date for the termination, as did the ordinances in such cases as *City of University Park v. Benners*, 485 S.W.2d 773, 775 (Tex.1972), and *City of Garland v. Valley Oil Co.*, 482 S.W.2d 342 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.), the period of recoupment should give the nonconforming owner a period after the date of the Board's order to convert to a conforming use, arrange for relocation, develop substitute facilities, or otherwise systematically deal with the disruption caused by the termination.

■■■■ Although a prospective period of amortization may be necessary to meet the test of reasonableness prescribed by the authorities set out in *Murmur*, 718 S.W.2d 797–98, this requirement does not mean that past depreciation of the structures representing the owner's investment at the time of the zoning change need not be considered in fixing the termination date. Nor does it mean that investments in the nonconforming use made after the zoning change must be amortized, because such investments, if included in the amortization base, could extend the nonconform-

ing use indefinitely. *City of Garland v. Valley Oil Co.*, 482 S.W.2d 342 (Tex.Civ. App.—Dallas 1972, writ ref'd n.r.e.), *cert. denied*, 411 U.S. 933, 93 S.Ct. 1902, 36 L.Ed.2d 392 (1973); *see City of University Park v. Benners*, 485 S.W.2d 773, 775–79 (Tex.1972) (reasonableness of opportunity for recoupment measured by conditions at time use is declared nonconforming). Even though the ordinance requiring the specific-use permit did not set a specific date for termination of nonconforming uses continuing without a permit, Dixie Metals could not reasonably expect under the provisions of the Dallas Development Code that it would be permitted to amortize subsequent investments in the absence of a specific-use permit.

Dixie Metals further contends that the rule excluding subsequent investments should not apply to investments it was required to make in order to continue its operations until completion of the amortization period. In this connection, Dixie Metals asserts that it was required to invest $1.4 million pursuant to a consent order and judgment in an earlier suit and that it will be required to invest $1,377,360 in additional pollution-control equipment. Dixie Metals argues that its only alternative to making these investments is to discontinue its operations and thus to abandon any opportunity to recoup its previous investment in the nonconforming use.

■■■■ We cannot agree that these investments must be included in the amortization base. If Dixie Metals' operations were subject to termination because of its failure to meet environmental standards or other requirements of law, that termination would be independent of any zoning regulations. We have not considered on appeal, and apparently neither the Board nor the trial court considered, any of the arguments of the Neighborhood Committee concerning Dixie Metals' failure to meet environmental standards because those standards are not relevant to the question of termination of a nonconforming use.

We can see no distinction in principle between investments necessary to comply with environmental standards and those

necessary to meet competition in an industry in which technology is changing. In an investment-intensive industry such as lead smelting, advances in technology may require additional investments from time to time, perhaps amounting to many times the original investment, in order to continue profitable operations in a competitive market. To require amortization of these additional investments would defeat the public interest, asserted through the city's police power, to terminate nonconforming uses.

Dixie Metals recognizes that its approach to the amortization problem would defeat termination of the smelting operation altogether, since it asserts that its figures show that under the proper set of assumptions, "no amortization period can reasonably be set." We cannot agree that the Board is wholly without authority under the police power or the Dallas Development Code to terminate this nonconforming use. As we explained in *Murmur*, the amortization technique does not depend on exact compensation for all economic loss, but, in order to be a reasonable exercise of the police power, a regulation in the public good must minimize the private loss by allowing the nonconforming use to continue after a zoning change for the normal expected life of the nonconforming structure so as to give the owner a reasonable opportunity to recoup his investment in the nonconforming use. *Murmur*, 718 S.W.2d at 797–98.

We conclude that the period of nonconforming use need not be extended to allow for subsequent investments necessary to continue a nonconforming use that otherwise would be in violation of law. Consequently, we hold that the Board did not abuse its discretion in fixing a termination date without allowing for amortization of these subsequent investments.

■ Dixie Metals' final contention is that the Board abused its discretion in fixing the termination date at December 31, 1990, because, even rejecting its market-value and income figures and accepting those presented by the city, and beginning the period in 1974 at the time of the zoning change, a minimum amortization period of 20.95 years would be required for recoupment of its initial investment of $1,600,000, without considering any subsequent investment.

We do not agree that these figures establish abuse of discretion. The amortization period fixed in the Board's order was not sixteen years beginning in 1974, but six years and two months, beginning on the day of the hearing, October 30, 1984. The principal question before the Board was the amount of Dixie Metals' original investment in the nonconforming use remaining at that time. Dixie Metals' argument does not allow for any depreciation of the original investment of $1,600,000. The city presented the testimony of Dr. Philip Porter, a professor of economics at Southern Methodist University. Dr. Porter testified that he had tried to get earnings figures and depreciation figures as shown on the company's books, but that the company had declined to provide any information except that its investment amounted to $3,000,000. He said that his estimate was based on what a prudent owner would do if he knew of the restriction. Such an owner, in his opinion, would take depreciation based on the economic life of the facility and invest it in other assets rather than reinvest it in the restricted use. (He used $3,000,000 as the amount of the original investment, although the data presented to the Board by Dixie Metals gave $1,600,000 as the original investment and $3,000,000 as the "total past investment," including later additions.)

Since Dr. Porter did not have access to the actual depreciation and earnings figures on Dixie Metals' books, he took an average of the non-accelerated depreciation allowed by the Internal Revenue Service for similar industrial facilities, which he said was fourteen years, of which ten years had already elapsed, leaving four-fourteenths of the original investment of $3,000,000 or $857,143.

In the absence of actual earnings figures, Dr. Porter used an average rate of return after taxes on capital investments in similar industrial facilities, which he estimated at a conservative fifteen percent, or $128,571 per year. At this rate, he estimat-

ed that the remaining investment would be returned in four more years, and he added thirty-eight days more to allow for the cost of clearing the site of hazardous wastes so that it would be marketable for other uses. On this basis, he suggested a termination date of December 7, 1988.

Although Dixie Metals had not previously complied with the city's request for financial information, its counsel prepared a written presentation and filed it with the Board a day or two before the hearing on October 30. In this presentation Dixie Metals took the position that the smelter was not a nonconforming use, for the same reasons now urged in this court, but also presented figures on market value, original and later investments, earnings, depreciation, and other items to be recouped from future earnings.

The company's investment figures were as follows:

| | |
|---|---|
| Original investment | $1,600,000 |
| Pollution control equipment | 1,400,000 |
| Additional investment necessary to meet environmental regulations | 1,377,360 |
| Total investment | $4,377,360 |
| Demolition costs (reduced by salvage) | 1,050,000 |
| | $5,427,360 [2] |
| Less land value | 167,500 |
| Amount to be recovered | $5,259,860 |

The company estimated its annual earnings at $91,000 per year, based on actual earnings in 1983, nine months in 1984, and projected earnings for 1985, but asserted that this figure should be reduced to $38,-000 because of the anticipated cost of operating the additional equipment to be installed. At this level of earnings a period of 135 years would be required to amortize the entire $5,259,860. Accordingly, Dixie Metals argued that no practicable amortization period could be fixed.

Dixie Metals made no attempt to estimate any past depreciation of its original investment. It presented current depreciated values for its equipment without specifying how long each item had been in service, and estimated that it would be fully

depreciated in eight years from the date of the hearing, except the buildings, which were estimated to have a remaining useful life of thirty years.

The members of the Board were not satisfied with the evidence before them. The chairman remarked that she regretted that Dixie Metals did not request more time to present a full financial disclosure because the Board could not properly determine how much of the use was already depreciated. The Board had no better estimate of the remaining useful life of the original facilities than Dr. Porter's estimate of four years. The Board could well be skeptical that Dixie Metals would continue to operate the smelter with earnings of only $38,-000 a year—less than a 0.9 percent return on its alleged investment of $4,209,860 (not including the demolition costs of $1,050,-000.) The Board may also have doubted the economic validity of the earnings figures in view of evidence that over 98 percent of its output was sold to its parent, General Battery Corporation, which used Dixie Metals as a source of raw materials. The Board had grounds to disallow Dixie Metals' past and projected investments in equipment necessary to comply with environmental regulations for reasons we have already discussed. Although necessary demolition costs may be a legitimate item of recoupment on termination of a nonconforming use, the Board may have made a reasonable allowance for this item, since it extended the amortization period to December 31, 1990—more than two years beyond the four years and thirty-eight days suggested by Dr. Porter. In the light of the circumstances and the evidence before the Board, we cannot say that the Board abused its discretion in ordering termination on that date. Consequently, we overrule all of Dixie Metals' points of error.

Affirmed.

---

**2.** This investment figure is only $206,000 less than the "market value" claimed by Dixie Met-

als.