In The
Court of Appeals
For The
First District of Texas
____________
NO. 01-00-00588-CV
____________

ELLER MEDIA COMPANY, Appellant

V.

CITY OF HOUSTON, TEXAS, Appellee




On Appeal from the 281st District Court
Harris County, Texas
Trial Court Cause No. 87-00827-A




OPINION ON REHEARING
           The opinion issued on October 25, 2001 is withdrawn, and this opinion is issued in
its place. 
           Appellant, Eller Media Company, and several other outdoor advertising plaintiffs sued
appellee, the City of Houston, challenging the validity of the amended Houston Sign Code
and alleging, among other things, a taking without compensation in violation of the Texas
and United States Constitutions, a violation of the right of free speech under the First
Amendment, and a violation of state law governing the regulation of billboards. The trial
court entered judgment declaring that the amended Sign Code does not violate the First
Amendment and does not constitute an unlawful taking of property under the United States
Constitution or the Texas Constitution. The judgment declared that signs designated “Permit
Nonconforming” are free from local amortization,


 signs designated as “Bring Into
Conformance” are to be removed according to the amortization schedule, and signs
designated as “Useful Life” are subject to immediate removal on the order of the City of
Houston. We affirm. 
BACKGROUND
           In 1980, the City of Houston, for the stated interests of traffic safety, property values,
and aesthetics, passed a Sign Code regulating, among other things, the size, placement, and
spacing of signs, including off-premise signs, which were defined as “any sign advertising
a business, person, activity, goods, products or services not usually located on the premises
where the sign is installed and maintained, or which directs persons to any location not on
the premises.” Houston, Tex., Ordinance 80-351 (March 26, 1980). The Sign Code provided
for a six-year amortization period, after which the signs must either conform to Code
regulations or be removed. Id. The Sign Code also contained a provision prohibiting the
construction of any new off-premise signs. Id.
           In 1985, the Texas Legislature passed House Bill 1330 (“HB 1330”),


 which
authorized municipalities to require the relocation, reconstruction, or removal of any sign and
extended a city’s authority over signs into its extraterritorial jurisdiction. Generally, HB
1330 required municipalities to compensate sign owners for such required activities
exclusively by cash payment or abatement of municipal property taxes. However, special
provisions were made for cities that had in effect on June 1, 1985 an ordinance providing for
compensating a sign owner, under an amortization plan, for a sign’s relocation,
reconstruction, or removal. The amortization provisions of HB 1330 superseded the six-year
amortization of the Houston Sign Code. Under the provisions of HB 1330, the sign owner
was to file records with the municipal board on sign control indicating those signs that could
be brought into conformance at a cost of 15% or less of the sign’s value and those signs that
could not be brought into conformance at that cost. One-half of the signs that could be
brought into conformance for 15% or less of value were to be designated as “bring into
conformance” (“BIC”). The other half were to be designated as “permit nonconforming”
(“PNC”). BIC signs were to be brought into conformance on a three-year schedule, one-third
in each year, at no cost to the city. Sign owners were permitted to keep PNC signs as
nonconforming uses with no time limitation. 
           Signs that could not be brought into conformance for 15% or less of value were
designated as “useful life” (UL) signs. The board was to determine the useful life of these
signs by type or category and permit the sign to remain in place as a nonconforming use for
a period of time, generally 65% of the useful life, under the city’s amortization plan. As an
alternative, the city could pay the sign owner, in cash or by tax abatement, 65% of the costs
of relocation, reconstruction, or removal of the sign. 
           As a last-minute floor amendment to HB 1330, subsection (k) was added to article 1,
section 6. This amendment provided:
For a sign erected after the effective date of this Act and as to any sign
currently in place that is made nonconforming by an extension of or
strengthening of an ordinance that was in effect on June 1, 1985, and contained
an amortization plan, then the amortization period shall equal useful life as
determined by the board in subsection (h) . . . . 

Act of May 31, 1985, 69th Leg., R.S., ch. 221, art. 1, § 6, 1985 Tex. Gen. Laws 1085,
repealed by Act of May 21, 1987, 70th Leg., R.S., ch. 149, § 49, 1987 Tex. Gen. Laws 1306. 
HB 1330 is now codified as chapter 216 of the Texas Local Government Code. Former
subsection 6(k) now reads:
For a nonconforming sign erected after September 1, 1985, or for a sign
in place on that date that later is made nonconforming by an extension of or
strengthening of an ordinance that was in effect on June 1, 1985, and that
provided an amortization plan, the amortization period is the entire useful life
of the sign. If it has not already done so, the board shall determine the entire
useful life of signs by type or category, such as mono-pole signs, metal signs,
and wood signs. The useful life may not be solely determined by the natural
life expectancy of a sign. 
Tex. Loc. Gov’t Code Ann. § 216.012 (Vernon 1999). Houston’s board on sign control
determined that the useful life of signs was 17 years for wood structures and 21½ years for
steel structures. 
           In 1987, Patrick Media Group of Houston, Inc. (Eller Media’s predecessor in interest)
and other members of Harris County Outdoor Advertising Association filed this lawsuit
against Houston, alleging that Houston’s Sign Code violated the state and federal
constitutions and state law. In 1992, Houston amended its Sign Code to declare that all off-premise signs within the city and its extraterritorial jurisdiction were nonconforming and
unauthorized. See City of Houston Building Code—General Provisions § 4619(b)
(1994).


 The amended Sign Code further provided, “The subject signs shall be removed
following amortization as provided in Article 1, Section 6(k) of Chapter 221, Acts of the 69th
Legislature, Regular Session, 1985.” City of Houston Building Code—General
Provisions § 4619(b). The Sign Code excluded structures “used exclusively . . . for
messages that do not constitute advertising . . . including messages and other copy of a nature
that is not commercial advertising because such a structure is not a ‘sign’” as defined in the
Sign Code. Id., § 4619(c). In addition, the abatement and amortization provisions did not
apply to any off-premise sign if those provisions would contravene state or federal law. Id.,
§ 4619(d). Specifically, billboards along the interstate and freeway primary system within
the city or its extraterritorial jurisdiction could not be abated by amortization because federal
law requires that owners be compensated in cash. The Sign Code also provided as follows:
The provisions of this section shall not be construed to excuse or delay
the removal of any off-premise sign that [is] nonconforming under any other
provision of this chapter; and it has been the intent of the City Council in
adopting this section that each and every off-premise sign within the sign code
application area be removed by amortization as soon as permitted by state and
federal law. 

Id., § 4619(e).
           In 1995, Eller Media Company bought the assets of Patrick Media Group of Houston
and joined this lawsuit as a plaintiff.


 The case was tried to the court, which made findings
of fact and conclusions of law. Among other things, the trial court concluded (1) the BIC
signs were to be brought into compliance and were to be removed after the applicable
amortization period; (2) the amortization period for the UL signs had expired and Houston
could order their immediate removal; and (3) the PNC signs, under HB 1330, were free from
amortization, were not subject to removal, and could exist as nonconforming signs. 
Judgment was entered in accordance with these conclusions, and Eller Media appealed. 
STANDARD OF REVIEW
           In an appeal of a judgment rendered after a trial to the court, the court’s findings of
fact have the same weight as a jury’s verdict. Amador v. Berrospe, 961 S.W.2d 205, 207
(Tex. App.—Houston [1st Dist.] 1996, writ denied). If findings of fact are not challenged,
they are binding on the parties and on this Court. Cushnie v. State Bar of Texas, 845 S.W.2d
358, 360 (Tex. App.—Houston [1st Dist.] 1992, writ denied). When challenged, findings
of fact are not conclusive if there is a complete reporter’s record. Amador, 961 S.W.2d at
207. When there is a reporter’s record, the trial court’s findings of fact are binding only if
supported by the evidence. Id. If the findings are challenged, the court of appeals will
review the legal and factual sufficiency of the evidence supporting the findings. State Bar
of Texas v. Roberts, 723 S.W.2d 233, 235 (Tex. App.—Houston [1st Dist.] 1986, no writ). 
In reviewing a no-evidence point, we consider only the evidence and inferences that tend to
support the finding, disregarding all evidence and inferences to the contrary. Vannerson v.
Vannerson, 857 S.W.2d 659, 666 (Tex. App.—Houston [1st Dist.] 1993, writ denied). If
there is any evidence of probative force to support the finding, i.e., more than a mere
scintilla, we will overrule the point. Id. In reviewing factual sufficiency points of error, we
must examine all of the evidence in the record, including any evidence contrary to the
judgment, to determine if the challenged finding is so against the great weight and
preponderance of the evidence as to be clearly wrong or unjust. Vickery v. Vickery, 999
S.W.2d 342, 376 (Tex. 1999). 
           The trial court’s conclusions of law are not binding on this Court and are reviewed de
novo. Connelly v. Paul, 731 S.W.2d 657, 661 (Tex. App.—Houston [1st Dist.] 1987, writ
ref’d n.r.e.). 

DISCUSSION
I.        First Amendment Issues
           Houston cites Metromedia as the controlling case in the regulation of off-premise
billboards in the interests of aesthetics and traffic safety. See Metromedia, Inc. v. City of San
Diego, 453 U.S. 490, 101 S. Ct. 2882 (1981). Eller Media contends that the outcome of this
case should not be controlled by Metromedia, arguing that Metromedia is a four-justice
plurality opinion. Eller Media contends that Houston and the trial court incorrectly “cobbled
together” portions of the five opinions in Metromedia to form a “majority view” that cities
may entirely eliminate commercial billboards without violating the First Amendment. 
           The Supreme Court has explicitly recognized that seven justices in Metromedia were
of the opinion that San Diego could completely ban billboards for reasons not related to
content. City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 425 n.20, 113 S. Ct.
1505, 1514 n.20 (1993). We agree with Houston that Metromedia controls the issues in this
case relating to the regulation of billboards. 
           A.       Unconstitutional Restriction on Commercial Speech
           In four issues, Eller Media complains that the amended Sign Code violates the First
Amendment of the United States Constitution. U.S. Const. amend. I. Eller Media first
contends that the Sign Code is an unconstitutional restriction on commercial speech, arguing
that the Sign Code fails the third and fourth elements of the Central Hudson test. See Cent.
Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of New York, 447 U.S. 557, 100 S. Ct.
2343 (1980). 
           Central Hudson provides a four-part analysis to be used in determining the validity
of restrictions on commercial speech: (1) whether the speech is concerning a lawful activity
and is not misleading; (2) whether the restriction seeks to implement a substantial
governmental interest; (3) whether the restriction directly advances the governmental interest;
and (4) whether the restriction reaches no further than necessary to accomplish the objective. 
See id., 447 U.S. at 566, 100 S. Ct. at 2351; see also Metromedia, 453 U.S. at 507, 101 S. Ct.
at 2892. There is no dispute in this case regarding the first two elements of this test. 
Houston does not contend that messages on the signs at issue are unlawful or misleading, and
Eller Media does not contend that governmental interests in traffic safety and aesthetics are
insubstantial. We therefore consider the third and fourth elements. Under the Central
Hudson test, Houston bears the burden of justifying the challenged restriction as furthering
its substantial interest. See Greater New Orleans Broad. Ass’n, Inc. v. United States, 527
U.S. 173, 183, 119 S. Ct. 1923, 1930 (1999). 
                      1.        Whether the restriction directly advances the interest
           Regarding the third element of the Central Hudson test, Eller Media argues that the
restriction on off-premise signs in the Sign Code does not significantly


 advance the
governmental interests of safety and aesthetics because Houston produced no evidence to
show a relationship between the existence of billboards and traffic safety and aesthetics. 
Eller Media directs us to Defendant’s Exhibit 32, the 1991 report of the Sign Control
Committee as “the only evidence that such a relationship might exist.” We construe Eller
Media’s challenge to be one of factual insufficiency to support the trial court’s findings of
fact numbers 26 and 29, which provide: 
26.The City of Houston’s determination that a reduction in the number of
off-premise billboards enhances the aesthetic appearance and economic
prospects of the community is reasonable and supported by the
evidence, including Defendant’s Exhibit 32. 
 
29.The City of Houston’s determination that a reduction in the number of
off-premise billboards enhances traffic safety is reasonable and
supported by the evidence, including Defendant’s Exhibit 32. 

           In support of its contention that Houston did not carry its burden of demonstrating a
relationship between the existence of billboards and traffic accidents or that the reduction of
the number of billboards would “significantly” enhance the appearance of Houston, Eller
Media cites the testimony of Ned E. Walton, former Associate Professor of Highway Design
and Traffic Engineering at Texas A & M University, before the Sign Control Committee,
as reported in Defendant’s Exhibit 32, which contains the legislative report of the Sign
Control Committee on the proposed sign ordinance. Eller Media specifically references Dr.
Walton’s statement that some research shows a correlation between billboards and traffic
safety, while other research does not; that “most of the studies could not withstand rigorous
statistical inquiry;” and that “there was no consensus between the highway profession and
the outdoor advertising industry that billboards contribute to highway accidents.” 
           The report of the Sign Control Committee contains a 10-page summary of the
testimony of several experts and others with some interest in outdoor advertising. According
to the report, Dr. Walton also testified that it was hard to provide statistical proof that
billboards contribute to highway accidents because rigorous experimental control is virtually
impossible. However, he concluded that “any effort that gives drivers a greater margin of
safety, including some regulation of off-premise billboards, is protection of the general
health, safety, and welfare of the public . . . .” Robert Jilla, assistant director of Houston’s
Public Works Department and director of the Traffic and Transportation Division, testified
to the committee that the Federal Highway Administration has reported a positive correlation
between the proliferation of signs along a roadway or at an intersection and the accident rate
at the same location. Dr. Helmut Zwahlen, professor of Industrial and Systems Engineering
at Ohio University, provided the committee with technical information on human reaction
times and said billboards are an added distraction, which may cause longer reaction times and
result in drivers’ not seeing regulatory and construction signs. 
           Ed McMahon, Visiting Scholar at the Environmental Law Institute in Washington,
D.C., Erin Arber, a registered landscape architect in Texas and chair of the Beautification
Committee of the South Montgomery County/Woodlands Chamber of Commerce, and Frank
Douglas, President-Elect of the American Institute of Architects, Houston Chapter, testified
regarding billboards as they relate to aesthetic appearance and visual pollution, generally
testifying that billboards are a major cause of visual pollution. Eller Media presented no
evidence to rebut Houston’s evidence that billboards cause visual pollution. 
           The evidence supporting the trial court’s findings that a reduction in the number of
off-premise billboards enhances the aesthetic appearance of the community and traffic safety
is not so weak, and the evidence to the contrary is not so overwhelming, that the findings
should be set aside. We hold that Houston has met its burden of establishing that the Sign
Code directly advances Houston’s interests in reducing traffic accidents and improving the
appearance of Houston. 
                      2.        Whether the restriction reaches no further than necessary
           Eller Media contends that Houston has not satisfied the fourth element of Central
Hudson because, according to Eller Media, there are other, less restrictive, means by which
Houston could address the aesthetic and safety concerns. Eller Media recognizes that
Houston “is not required to employ the least restrictive means conceivable, but must
demonstrate narrow tailoring of the challenged regulation to the asserted interest—‘a fit that
is not necessarily perfect, but reasonable.’” Greater New Orleans Broad., 527 U.S. at 188,
119 S. Ct. at 1932 (quoting Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480,
109 S. Ct. 3028, 3035 (1989)). Nevertheless, Eller Media implies that there are other means
that should have been employed.


 Such an implication is not consistent with Eller Media’s
recognition that, under Greater New Orleans Broadcasting, Houston is not required to use
the least restrictive means available. See id., 527 U.S. at 188, 119 S. Ct. at 1932. 
           Eller Media also argues that the trial court did not apply the “modern Central Hudson”
test because it did not require Houston to prove that the Sign Code would significantly reduce
traffic accidents and significantly improve the appearance of Houston and to prove that less
burdensome means would accomplish Houston’s purposes. 
           Eller Media contends that Houston did not prove that reducing or eliminating
billboards would “significantly” enhance the appearance of Houston because, when the Sign
Code was passed, there were only 4,372 billboard structures (with 7,120 sign faces)


 in
Houston, compared with 99,966 on-premise signs, many of which were the same size and
height as billboards, and, therefore, the effect of removing off-premise billboards would be
minimal. Eller Media compares the facts of this case with those in Discovery Network, 507
U.S. at 410, 113 S. Ct. at 1505.
           In Discovery Network, the city granted permits to two commercial publishers to place
62 newsracks on public property for the purpose of distributing commercial handbills. Id.,
507 U.S. at 412-13, 113 S. Ct. at 1508. At that time, there were 1500 to 2000 similar
newsracks on public property for the distribution of newspapers. Id., 507 U.S. at 414, 113
S. Ct. at 1509. The city later revoked the permits of the commercial publishers, citing the
Municipal Code, which completely banned the distribution of commercial handbills. Id., 507
U.S. at 412-13, 113 S. Ct. at 1508. The city justified this ban as promoting safety and
aesthetics. Id., 507 U.S. at 414, 113 S. Ct. at 1509. The Supreme Court determined that
there was no basis for treating the newsracks for commercial publications (handbills) and
noncommercial publications (newspapers) differently because both presented the same safety
and aesthetic problems. Id., 507 U.S. at 428, 113 S. Ct. at 1516. The restriction lacked the
necessary “fit” between the city’s goals and the means of regulation. Id. The Court agreed
with the trial court and the court of appeals, which characterized the benefit to be derived
from the removal of 62 commercial newsracks while leaving 1500 to 2000 noncommercial
newsracks in place as “minute” and “paltry.” Id., 507 U.S. at 418, 113 S. Ct. at 1510.
           Eller Media argues that the removal of off-premise signs would not make a significant
improvement in the appearance of Houston when there are so many on-premise signs, and,
therefore, Houston has not carried its burden. Eller Media’s argument fails because the
reasoning of the courts in Discovery Network does not apply to the distinction made in our
case between off-premise and on-premise signs. On-premise signs serve important functions,
including identifying the occupants of the premises and the nature of their businesses or
services. The Supreme Court in Metromedia determined that cities may, with good reason,
make different regulations for off-premise and on-premise signs, including prohibiting off-premise signs while permitting on-premise signs. See Metromedia, 453 U.S. at 512, 101 S.
Ct. at 2895. 
           Under the fourth prong of the Central Hudson test, Houston was required to show that
the regulation reached no further than necessary to accomplish its objective. See
Metromedia, 453 U.S. at 507, 101 S. Ct. at 2892. With respect to the fourth prong, the court
in Metromedia said: 
If the city has a sufficient basis for believing that billboards are traffic hazards
and are unattractive, then obviously the most direct and perhaps the only
effective approach to solving the problems they create is to prohibit them. The
city has gone no further than necessary in seeking to meet its ends. Indeed, it
has stopped short of fully accomplishing its ends: It has not prohibited all
billboards, but allows onsite advertising and some other specifically exempted
signs. 

Id., 453 U.S. at 508, 101 S. Ct. at 2893. Houston, like San Diego, has gone no further than
necessary to accomplish its purpose. Houston has, therefore, satisfied the fourth prong of the
Central Hudson test. 
           We conclude that the Sign Code is not an unconstitutional restriction on commercial
speech. Accordingly, we overrule Eller Media’s first issue. 
           B.       Inadequate Alternate Channels of Communication
           Eller Media also contends that the Sign Code violates the First Amendment because
it leaves small businesses and public service organizations with inadequate channels to
communicate their messages. Eller Media argues that the smaller, poster-style billboards,
which tend to be used by small businesses and public service organizations, would be
disproportionately affected by the code. 
           Eller Media argues that, when a regulation forecloses an entire medium of expression,
there must be alternative channels of communication that “provide realistic and adequate
media” to communicate the speaker’s message, citing City of Ladue v. Gilleo, 512 U.S. 43,
114 S. Ct. 2038 (1994), and Linmark Associates, Inc. v. Township of Willingboro, 431 U.S.
85, 97 S. Ct. 1614 (1977). 
           These cases are clearly distinguishable from the present case. In Gilleo, the medium
of expression at issue involved signs in residential front yards. 512 U.S. at 45, 114 S. Ct. at
2040. A city ordinance prevented Gilleo from placing a sign in her yard with the message,
“Say No to War in the Persian Gulf.” Id. The Court stated: 
Displaying a sign from one’s own residence often carries a message quite distinct
from placing the same sign someplace else . . . . Precisely because of their location,
such signs provide information about the identity of the “speaker.” 

Id., 512 U.S. at 56, 114 S. Ct. at 2046. In a footnote, the Court references Virginia State Bd.
of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 772 n.24, 96 S. Ct.
1817, 1831 n.24 (1976), which states, “Since advertising is the sine qua non of commercial
profits, there is little likelihood of its being chilled by proper regulation and forgone
entirely.” Gilleo, 512 U.S. at 57 n.15, 114 S. Ct. at 2046 n.15. 
           The issue in Linmark Associates was a prohibition of “For Sale” signs in residential
front yards to stem a perceived flight of white homeowners from an integrated neighborhood. 
431 U.S. at 86, 87 S. Ct. at 1615. The Supreme Court questioned whether there were
satisfactory alternative methods of communicating the information conveyed by a “For Sale”
sign in front of a house. Id., 431 U.S. at 93, 87 S. Ct. at 1618. The Court also pointed out
that the regulation was content-based, not a place or manner restriction, because other types
of signs were not barred. Id., 431 U.S. at 93-94, S. Ct. at 1619. The Court determined that
the ordinance was constitutionally defective because the City Council sought to restrict the
free flow of information “because it fears that otherwise homeowners will make decisions
inimical to what the Council views as the homeowners’ self-interest and the corporate
interest of the township: they will choose to leave town.” Id., 431 U.S. at 96, 87 S. Ct. at
1620. 
           Eller Media’s concern for public service organizations’ lack of communication
channels is also misplaced. Because public service organizations’ messages would constitute
noncommercial speech, Eller Media is free to maintain billboards exclusively, at all times,
for their use because the Sign Code specifically excludes such structures from its regulations. 
           We overrule Eller Media’s second issue. 
           C.       Content-based Distinctions Between Types of Noncommercial Speech

           Eller Media contends the Sign Code makes content-based distinctions among types
of noncommercial speech. Eller Media suggests that the definition of “advertising” includes
noncommercial speech. Presumably, Eller Media is arguing that a sign could “seek the
attraction of or . . . direct the attention of the public to goods, services or merchandise” of a
noncommercial nature. If so, such “advertising” would remain noncommercial speech. 
           The trial court found, in finding of fact number 31, that
Section 4619 regulates commercial speech only and not other forms of
speech. The preamble to Ordinance 92-36 provides that “the Sign Ordinance
was never intended to regulate ideological, political or other non-commercial
speech and the City Council desires to clearly limit the application of the Sign
Ordinance, as strengthened, to “commercial signs.” The word “advertising”
in Section 4619 contemplates commercial speech only. 

           In addition to the preamble quoted in the court’s finding, the Sign Code provides the
following exclusion: 
The provisions of this section shall not be construed to require the removal of
a structure that is used exclusively and at all times . . . for messages that do not
constitute advertising, including, but not limited to, political messages,
religious or church related messages, public service, governmental and
ideological messages and other copy of a nature that is not commercial
advertising because such a structure is not a “sign” . . . , as that term is
defined, for purposes of this chapter and is not subject to regulation under this
chapter. 

City of Houston Building Code—General Provisions § 4619(c) (emphasis added). 
Thus, a “sign” that “advertises” a noncommercial message falls under the exclusion, and the
Sign Code does not make content-based distinctions between types of noncommercial
speech. 
           We overrule Eller Media’s third issue. 
           D.       Unfettered Discretion of Sign Administrator
           Eller Media also complains that the Sign Code gives unfettered discretion to a sign
administrator to determine the legality of a billboard based upon the content of its message. 
Eller Media argues that the Sign Code’s definition of “advertising” is ambiguous, thus
placing substantial discretion in the hands of the administrator. 
           The Sign Code defines “advertising” as follows:
Advertising shall mean to seek the attraction of or to direct the attention of the
public to any goods, services or merchandise whatsoever. 

City of Houston Building Code—General Provisions § 4602. When considered in
conjunction with the exclusion for messages that are not commercial advertising, we do not
find the definition of advertising to be ambiguous. 
           Eller Media cites Desert Outdoor Advertising, Inc. v. City of Moreno Valley, 103 F.3d
814 (9th Cir. 1996), as an example of an ordinance found to be unconstitutional because it
granted discretion to deny a permit on the basis of ambiguous and subjective reasons. In
Desert Outdoor, issuance of a permit to erect an off-site sign was subject to a finding that the
sign “will not have a harmful effect upon the health or welfare of the general public and will
not be detrimental to the welfare of the general public and will not be detrimental to the
aesthetic quality of the community or the surrounding land uses.” Id. at 818. The court
concluded that the permit requirement was unconstitutional because it gave city officials
“unbridled discretion in determining whether a particular structure or sign will be harmful
to the community’s health, welfare, or ‘aesthetic quality.’” Id. at 819. 
           Eller Media contends that the power and authority granted to the sign administrator
“to administer and enforce the terms and conditions” of the Sign Code, to inspect and
approve signs, “to revoke any and all licenses or permits,” and “to adopt regulations required
to implement the provisions of” the Sign Code is evidence of the administrator’s “substantial
discretion” and “substantial power.” Eller Media does not address the fact that all the
administrator’s power and authority is in relation to administering and enforcing the terms
and conditions of the Sign Code. The responsibility of the sign administrator is set out in the
Sign Code: 
[T]o administer and enforce the terms and conditions of this chapter and all
other provisions of law relating to signs. . . . [T]o enforce and carry out all
provisions of this chapter. 

City of Houston Building Code—General Provisions § 4604(a). Furthermore, the
decisions of the sign administrator are subject to an appeal process, first to the General
Appeals Board, then to City Council. City of Houston Building Code—General
Provisions §4604(e). Regulation without some means of enforcement would be
meaningless. 
           We hold that the discretion of the sign administrator is not “unfettered.” Accordingly,
we overrule Eller Media’s fourth issue. 
II.      Unconstitutional Taking
           In its fifth issue, Eller Media contends that the amortization scheme in the Sign Code
results in an unconstitutional “taking” without just compensation. To support its contention,
Eller Media argues that the trial court improperly relied on City of University Park v.
Benners, 485 S.W.2d 773 (Tex. 1972), and failed to make the correct “regulatory taking”
analysis under Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S. Ct.
2646 (1978). 
           A taking generally involves the government’s taking ownership or possession of a
person’s property for public use or imposing regulations on the property that render it
valueless. Such takings, under both the United States Constitution and the Texas
Constitution, must be compensated. The Fifth Amendment of the United States Constitution
does not mention the type of compensation, but federal case law generally requires monetary
compensation. See U.S. Const. amend. V (“nor shall private property be taken for public
use, without just compensation”); see also, e.g., United States v. Reynolds, 397 U.S. 14, 16,
90 S. Ct. 803, 805 (1970); Olson v. Unites States, 292 U.S. 246, 255, 54 S. Ct. 704, 708
(1934). The Texas Constitution specifically provides that the compensation be monetary. 
Tex. Const. art. I, § 17 (“when taken, except for the use of the State, such compensation
shall be first made, or secured by a deposit of money”). 
           When the government imposes regulations that restrict the use of property, but do not
interfere with the ownership or possession by the owner and do not render the property
valueless, a taking does not necessarily occur, and any resulting economic loss to the owner
does not necessarily require compensation. See Penn Cent. Transp. Co. v. City of New York,
438 U.S. 104, 138, 98 S. Ct. 2646, 2666 (1978). Such regulations may be an exercise of
governmental police powers, and amortization is a valid technique to allow owners of
property to recoup their investment in property that becomes nonconforming as a result of
the regulations. See Benners, 485 S.W.2d at 779. 
           In Penn Central, the Landmarks Preservation Commission had designated the Grand
Central Terminal, owned by Penn Central Transportation Co. and its affiliates, as a
“landmark.” Penn Central, 438 U.S. at 116, 98 S. Ct. at 2655. Because the terminal was
a landmark, the owners were required to obtain the Commission’s approval of any exterior
alterations to the building. Id., 438 U.S. at 112, 98 S. Ct. at 2653. The issue in Penn Central
was whether the Commission’s rejection of Penn Central’s plan for constructing a multistory
office building over the terminal was a taking without just compensation in violation of the
Fifth and Fourteenth Amendments. Id., 438 U.S. at 117, 119, 98 S. Ct. at 2655-56. The
Court stated that factors of significance to be considered in determining whether a regulation
constitutes a taking include (1) the economic impact of the regulation on the claimant and,
particularly, the extent to which the regulation has interfered with distinct investment-backed
expectations and (2) the character of the governmental action. Id., 438 U.S. at 124, 98 S. Ct.
at 2659. The Court said, “A ‘taking’ may more readily be found when the interference with
property can be characterized as a physical invasion by government . . . than when
interference arises from some public program adjusting the benefits and burdens of economic
life to promote the common good (internal citation omitted).” Id.
           The Court cited numerous examples of regulations that diminish property values
without requiring compensation. These examples included the exercise of taxing power, the
creation of zoning laws, the prohibition of industrial use, the requirement that parcels of land 
be left unimproved, and the placing of height restrictions on building. Id., 438 U.S. at 124-25, 98 S. Ct. at 2659-60. The Court also cited examples of the termination of existing uses
without compensation for loss: cutting cedar trees to save apple trees, terminating use as a
brickyard, closing a gold mine to make workers available for more necessary mining,
requiring a railroad to share grade-improvement costs, prohibiting the manufacture of carbon
black, prohibiting the operation of a livery stable, prohibiting a liquor business, and banning
certain excavation so that a sand and gravel mining business was effectively prohibited. Id.,
438 U.S. at 126-27, 98 S. Ct. at 2660. 
           The Court in Penn Central considered the theme of the law at issue—reasonable
return on investment—in reaching its conclusion that the regulation in that case was not a
taking. Id., 438 U.S. at 110, 98 S. Ct. at 2652. The Court found that the restrictions were
substantially related to the promotion of the general welfare, permitted reasonable, beneficial
use of the site, and afforded owners opportunities to enhance the site and also to enhance
other properties through the transfer of air-space rights to those other properties. Id., 438
U.S. at 138, 98 S. Ct. at 2666. 
           Texas case law is consistent with the principles of Penn Central. 
           In City of College Station v. Turtle Rock Corp., 680 S.W.2d 802 (Tex. 1984), the court
reiterated its refusal to establish a bright line for distinguishing between an exercise of police
power that constitutes a taking and one that does not. Id. at 804 (citing City of Austin v.
Teague, 570 S.W.2d 389, 391 (Tex. 1978), and DuPuy v. City of Waco, 396 S.W.2d 103, 107
(Tex. 1965)). Whether a police-power regulation results in a taking is a question of law. Id.
at 805. To be an exercise of police power that does not constitute a taking, the regulation
(1) must be adopted to accomplish a legitimate goal—must be substantially related to health,
safety, or general welfare of the people— and (2) must be reasonable, not arbitrary. Id. “If
reasonable minds may differ as to whether or not a particular zoning ordinance has a
substantial relationship to the public health, safety, morals, or general welfare . . . the
ordinance must stand as a valid exercise of the city’s policy power.” Id. (quoting Hunt v.
City of San Antonio, 462 S.W.2d 536, 539 (Tex. 1971)). 
           In Mayhew v. Town of Sunnyvale, 964 S.W.2d 922 (Tex. 1998), the Texas Supreme
Court recognized that takings can be either physical or regulatory. Id. at 933. The plaintiffs
had contended that the Town’s denial of the plaintiffs’ development proposal to build 3,600
housing units was a taking of their property without just compensation. Id. at 926. The
supreme court stated the general rule that application of a general zoning law to a particular
property is a regulatory taking if the ordinance “does not substantially advance legitimate
state interest” or if the ordinance denies an owner all “economically viable use of his land.” 
Id. at 933 (citing Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S. Ct. 2138, 2141 (1980)). 
The court relied on Penn Central and other Supreme Court and Texas opinions in its
reasoning: property regulation must “substantially advance” a legitimate governmental
interest to pass constitutional muster; if the regulation does not, it is a taking. Id. at 934. If
the regulation does, then the court must determine whether the regulation (1) denies the
owner all economically viable use of the property or (2) unreasonably interferes with the
owner’s rights to use and enjoy the property. Id. at 935. Under the first factor, the court
must determine whether value remains in the property after the governmental action. Id. 
Under the second, the court must consider the economic impact of the regulation and the
extent to which the regulation interferes with investment-backed expectations. Id. 
           In Mayhew, there was no compensable regulatory taking because the owner’s land still
had value, and the owners, having originally purchased the land for ranching, had no
reasonable investment-backed expectation to build 3,600 housing units on the land. Id. at
937-38. 
           The Texas Supreme Court introduced the concept of amortization as a valid technique
to terminate nonconforming property uses in Benners, 485 S.W.2d 773 (Tex. 1972).


 The
court recognized amortization as a proper method of allowing a property owner to recoup his
investment before the government required the termination of a use made nonconforming by
the institution of a regulation. Id. at 777-78. 
           In Benners, the city passed a zoning ordinance in 1940 that effectively terminated the
commercial use of two lots that had been used for commercial purposes since 1925. Id. at
775. The ordinance provided that any nonconforming use must be removed or converted to
a conforming use prior to January 1, 1965. Id. The owner of the two lots complained that
this was a taking without compensation. Id. at 776. The court considered rulings in other
jurisdictions on the issue of the power of municipalities to require termination of existing
uses of property made nonconforming by zoning regulations and noted that the prevailing
view recognized the use of amortization as a valid exercise of its police power. Id. at 777. 
The court stated, 
The usual approach rests on the principle that there is not a legally
significant difference between existing and prospective uses in land; and that
the required termination of a pre-existing land use, with allowance for
recoupment, is no different in kind from restrictions upon future land use
alternatives. So it is concluded that termination does not constitute a ‘taking’
in the eminent domain sense but an exercise of the police power in the public
interest; and that such an enactment is subject to the same tests of validity as
other legislative acts, i.e., whether it is reasonable and bears a fair relationship
to the object sought to be obtained. 
Id. at 777-78. The court continued, 
We are in accord with the principle that muncipal zoning ordinances
requiring the termination of nonconforming uses under reasonable conditions
are within the scope of municipal police power; and that property owners do
not acquire a constitutionally protected vested right in property uses once
commenced or in zoning classifications once made. Otherwise, a lawful
exercise of the police power by the governing body of the City would be
precluded. 

Id. at 778. The court reasoned that the owner of the nonconforming, terminated use, after
being given the opportunity to recover his investment in that property, would be placed in the
equivalent position of the owner of property on which future use was restricted. Id. at 779. 
The court noted that, in the Benners case, the owner had 25 years notice that the
nonconforming use would have to terminate. The court determined that this was sufficient
time to recoup any loss in property value caused by the zoning ordinance. Id. 
           Following Benners, Texas courts have consistently held that amortization is a valid
technique to allow owners of property to recoup their investment in property that became
nonconforming as a result of a city’s exercise of its police power. See, e.g., Bd. of
Adjustment v. Patel, 887 S.W.2d 90, 93 (Tex. App.—Texarkana 1994, writ denied) (period
of amortization to be determined by amount of investment at time motel became
nonconforming); Bd. of Adjustment v. Patel, 882 S.W.2d 87, 89-90 (Tex. App.—Amarillo
1994, writ denied) (same); Bd. of Adjustment v. Winkles, 832 S.W.2d 803, 806 (Tex.
App.—Dallas 1992, writ denied) (increase in inventory after business became
nonconforming does not increase period of amortization); Williams v. City of Fort Worth,
782 S.W.2d 290, 294 (Tex. App.—Fort Worth 1989, writ denied) (recognizing amortization
as a valid method of forcing property owners to comply with zoning restrictions); City of
Houston v. Harris County Outdoor Adver., 732 S.W.2d 42, 49-50 (Tex. App.—Houston
[14th Dist.] 1987, no writ) (same); Neighborhood Comm. on Lead Pollution v. Bd. of
Adjustment, 728 S.W.2d 64, 71 (Tex. App.—Dallas 1987, writ ref’d n.r.e.) (period of
amortization determined by investment remaining at time property becomes nonconforming);
Murmur Corp. v. Bd. of Adjustment, 718 S.W.2d 790, 797-98 (Tex. App.—Dallas 1986, writ
ref’d n.r.e.) (defining “full value” for recoupment purposes as owner’s actual investment in
nonconforming use at the time of the zoning change); Lubbock Poster Co. v. City of Lubbock,
569 S.W.2d 935, 945-46 (Tex. App.—Amarillo 1978, writ ref’d n.r.e.) (amortization is a
valid method for recouping investment). 
           These cases generally recognized zoning and other regulation of property as an
exercise of a city’s police power, and they defined the investment recouped through
amortization as the investment remaining at the time the property became nonconforming,
but did not include any investment made in the property at a later time. See Winkles, 832
S.W.2d at 806; Neighborhood Comm., 728 S.W.2d at 71. 
           In the present case, the trial testimony established that the purchase price of a
billboard was, on an average, 10 times the annual cash flow. The amortization periods of 17
years and 21½ years for the BIC signs began in 1992. These amortization periods allowed
more than enough time for the owners to recoup their investment and to make additional
profits. Eller Media, knowing of the amortization scheme of the Sign Code, purchased
Patrick Media Group’s assets in 1995 and additional signs in 1997. The president of the
Houston branch of Eller Media testified that the price it paid for Patrick Media was not
discounted because of the amortization scheme. However, at the time of the purchase, there
were 14 years of use remaining for wood structures and 18 years remaining for steel
structures. The trial court found, in finding of fact number 36, “Plaintiffs presented no
credible evidence to show that they will be unable to recoup their initial investment and a rate
of return in any billboard subject to removal by amortization.” That finding has not been
challenged on appeal. 
           We hold that the regulations in the Sign Code are a reasonable exercise of the City’s
police power and are not a compensable taking. We further hold that the amortization
periods of 17 years and 21½ years permitted by the Sign Code are sufficient for Eller Media
to recoup its investment.


 Accordingly, we overrule Eller Media’s fifth issue. 
III.     Conflict with HB 1330
           In its sixth issue, Eller Media contends that the Sign Code is in conflict with HB 1330. 
Eller Media argues that the purpose of HB 1330, as shown in its legislative history, was to
institute a statewide ban on amortization of billboards. On the other hand, Houston contends
the “entire framework of H.B. 1330 was designed to create different regulatory authority”
between cities that had pre-existing amortization plans and those that did not. Both sides
reference the legislative history as seen in remarks before the Senate State Affairs
Committee. The legislative history clearly shows that, in considering the Bill, the committee
worked out a compromise between a total ban on amortization and the needs of those cities
with an amortization scheme already in place. 
           However, we need not rely on legislative history, because the statute is neither vague
nor ambiguous. HB 1330 provides generally for only two methods of compensation for the
relocation, reconstruction, or removal of signs: monetary or tax abatement. Special
provisions are made for those cities with an ordinance existing on June 1, 1985 providing for
compensation through an amortization plan. Those special provisions include a subsection,
added as a floor amendment, clarifying that the special provisions are applicable to signs
erected after the effective date of the enactment of HB 1330 and are also applicable to signs
made nonconforming by an extension or strengthening of the city ordinance. 
           Eller Media argues, without authority, that the word “strengthening” in HB 1330
“should be interpreted to mean changing an ordinance so that it applies to types of signs that
were not regulated as of June 1, 1985, but were located within the city limits.” We see no
basis for such a narrow construction of “strengthening,” nor do we think “strengthening” is
a term of art in need of construction. HB 1330 clearly contemplates the ordinary meaning
of “strengthening,” i.e., “to make or become strong or stronger.” See Webster’s II: New
College Dictionary 1091 (1995). 
           We hold that the Houston Sign Code is not in conflict with HB 1330. Accordingly,
we overrule Eller Media’s sixth issue. 
IV.     Removal of UL Billboards
           In its seventh issue, Eller Media contends that the trial court erroneously ruled that
Houston may order the immediate removal of all UL signs. Eller Media challenges the
findings of the trial court that HB 1330 requires the removal of UL billboards after 65% of
their useful life. Eller Media correctly argues that HB 1330 does not require the removal of
any signs. HB 1330 expresses the legislative intent neither to require nor to prevent the
relocation, reconstruction, or removal of any sign in a municipality. Section 6 of HB 1330
applies only to those cities that had adopted amortization before June 1, 1985. Section 6
creates a category of signs designated as UL and provides the amortization schedule for those
signs. It does not say what happens at the end of the amortization period. Either bringing
the UL billboards into compliance or removing them would be consistent with the language
of Section 6. 
           Eller Media also argues that the Sign Code does not require the removal of any signs
before 2009 or 2013—the same schedule as the BIC signs (the only other category of signs
to be removed). This argument has no merit. In section 4619(e), entitled “Previously
Nonconforming Signs,” the Sign Code provides:
The provisions of this section shall not be construed to excuse or delay
the removal of any off-premise sign that [is] nonconforming under any other
provision of this chapter; and it has been the intent of the City Council in
adopting this section that each and every off-premise sign within the sign code
application area be removed by amortization as soon as permitted by state and
federal law. 

City of Houston Building Code—General Provisions § 4619(e) (emphasis added). 
Eller Media does not address section 4619(e) of the Sign Code in its brief. 
           We conclude that, under section 4619(e), the UL signs remain under the amortization
schedule as provided in HB 1330, effective September 1, 1985.


 HB 1330 does not prevent
the removal of the UL billboards, and the Sign Code requires their removal.
           We hold that the judgment correctly permits Houston to order the immediate removal
of all UL signs. Accordingly, we overrule Eller Media’s seventh issue. 
           We affirm the judgment. 
 
 
                                                                             Sam Nuchia
                                                                             Justice

Panel consists of Justices Hedges, Nuchia, and Hanks.